**STATE of Missouri, Respondent,**

v.

**Cordell SHARKEY, Appellant.**

**No. 58971.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 24, 1991.

Brian N. Brown, St. Louis, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

CRIST, Judge.

Defendant appeals his jury conviction for illegal distribution and delivery of a controlled substance, cocaine. Defendant was sentenced to five years' imprisonment. We affirm.

On October 30, 1989, Defendant was approached by an undercover officer with the Street Corner Apprehension Team of the St. Louis Police Department. The officer stated he was interested in purchasing crack cocaine. Defendant replied that he could get some. The officer gave Defendant twenty dollars. Defendant left and returned with the cocaine after a short time. He was then arrested. The twenty dollars was never recovered, and Defendant had no more cocaine on his person. Because the transaction took place about 300 feet from Eugene Fields Elementary School, Defendant was charged with unlawfully distributing a controlled substance within 1000 feet of a school in violation of § 195.214, RSMo. However, he was convicted of the lesser included offense of distribution and delivery of a controlled substance.

■ In his first point, Defendant asserts the trial court erred in finding him competent to stand trial and in denying his motion for a continuance so that he could undergo a psychiatric examination. "[I]f a judge at any stage of the proceedings has reasonable cause to believe that a defendant has a mental defect or disease preventing fitness to proceed, a psychiatric examination must be ordered and, if necessary thereafter, a hearing held to make a determination of that question." *Howard v. State*, 698 S.W.2d 23, 25 [9, 10] (Mo.App. 1985). However, the trial court is vested with broad discretion with regard to ordering the mental examination. *Id.*

■ When Defendant was arrested, he was wearing female clothing and had silicone breast implants. Up to the date of trial, he cooperated with his lawyer and did not give his lawyer any reason to believe he suffered from mental illness. However, Defendant began making odd statements the day the trial proceedings commenced, July 2, 1990. He requested political asylum in Rome. He stated that his case had political overtones and asked for a postponement so that he could talk to the United States Attorney General. He said his sister was outside the courthouse with the National Guard waiting for him. He alleged his family had recently been murdered. He stated he needed a new lawyer because his lawyer and George Peach, the St. Louis City Prosecutor, had conspired to put a machine in his cell which kept him awake for four days and impaired his hearing. Defendant then refused to cooperate with his lawyer in court. Defendant had been admitted to Malcolm Bliss Mental Health Center, 1985, claiming to have thoughts of suicide. However, he subsequently admitted to the doctors that he faked his "depression" and suicide intentions in order to have food and a place to stay. Defendant was diagnosed as malingering, or trying to fake a mental illness.

Defendant's lawyer requested a psychological examination, and the trial court granted this request. Dr. Max Givon examined Defendant and gave the court a written report of his examination. Dr. Givon found that Defendant did not suffer from a mental disease or defect, understood the proceedings against him, and was capable of assisting in his defense, should

he choose to do so. The trial court determined Defendant was competent to stand trial.

Defendant then made an oral motion to proceed *pro se*, an oral motion for a continuance, and an oral motion for a change of venue. The trial court found that Defendant was merely attempting to delay the proceedings and did not grant his motions.

On July 9, 1990, the day the voir dire began, Defendant refused to come out of his jail cell and appear in court. His lawyer stated that Defendant was voluntarily absent from the courtroom. The trial proceeded without Defendant's presence.

On July 11, 1990, Defendant acted like he was trying to hang himself in his cell. Law enforcement officers observed that this was not a serious attempt to commit suicide. Defendant was sent to Malcolm Bliss Mental Health Center. There, Defendant denied he had any suicidal or homicidal ideation. The psychiatrist who examined Defendant determined that Defendant did not have any intention of committing suicide. He noted that Defendant was tired of being in jail and found that he was a manipulative individual who was malingering.

A psychologist from the City Jail also testified. He stated he met Defendant within thirty days after Defendant was incarcerated and had since had almost daily contact with Defendant. He had last seen Defendant on July 2, 1990, but testified Defendant was competent to stand trial at that time. He read the report of Defendant's suicide attempt and testified that nothing in that report changed his opinion as to Defendant's competency to stand trial. Defendant's trial proceeded that day.

The trial court found that Defendant's odd behavior was the result of his desire not to go to trial. The evidence confirms this. *See Howard*, 698 S.W.2d at 25[11]. Defendant did not have a mental disease or defect rendering him unfit to proceed. Point denied.

■■■ In his second point, Defendant submits the trial court erred in denying his request to represent himself at trial. It is necessary to look briefly at the context of Defendant's request. When Defendant began making strange statements, the trial court delayed conducting voir dire and instead conducted the hearing on Defendant's competency to stand trial. The court found that Defendant had "manufactured" the statements. A psychologist testified that in his professional opinion, Defendant was competent to stand trial and was malingering. The trial court found Defendant competent to stand trial. Defendant next tried unsuccessfully to fire his lawyer.

Defendant then requested the court's permission to proceed *pro se*. The psychologist who had examined Defendant pursuant to his lawyer's request stated in his report:

> The defendant appears to possess sufficient intellectual capacity and sufficient understanding of basic court procedures and personnel to engage in this pursuit although he lacks any training. However, because of the presence of antisocial traits and his history of manipulation and malingering, it is felt that his desire to represent himself may be based more on an attempt to further hinder court proceedings.

The trial court then found both that Defendant's request was untimely, and that he was merely trying to delay the case. After the court's denial of his request, Defendant asked for a continuance and a change of venue, and then refused to attend the trial.

The right to self-representation is intended to ensure a defendant's right to a full and fair trial and is not intended to enable the defendant to avoid or delay the trial for any unjustifiable reason. *State v. Herron*, 736 S.W.2d 447, 449[4] (Mo.App.1987). Here, the trial court properly denied Defendant's request to proceed *pro se*. Even if the request is not considered untimely, the circumstances surrounding Defendant's request support the finding that Defendant's purpose was to delay the trial. *See Herron*, 736 S.W.2d at 449. Point denied.

Finally, Defendant asserts the trial court erred in denying his motion to quash the jury panel after the prosecutor had used all

six peremptory challenges to exclude black venirepersons from the jury panel. He submits that the use of peremptory strikes against venirepersons Preston, Mitchell and Jenkins were racially motivated.

After challenges for cause were made, the venire consisted of twenty-six individuals, twelve of whom were black. The State used its peremptory strikes to remove six black individuals from the venire. The prosecutor's explanation as to why she struck the three individuals Defendant complains of was satisfactory. She stated she struck Venireperson Preston because he was familiar with the Street Corner Apprehension Team from television, because he had been convicted of prostitution, and because he had a brother-in-law convicted on a drug charge. She stated Venireperson Mitchell was struck because he had been in the military police and might have his own views on proper police procedure, he had been the victim of two separate assaults, and had a relative in the penitentiary. Venireperson Jenkins was struck because he had been arrested and questioned by the police, but had done nothing wrong; the prosecutor stated that this could be construed as negative police contact.

The trial court found that none of the State's peremptory strikes was racially motivated. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *State v. Antwine*, 743 S.W.2d 51 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). The trial court followed the mandates of *Batson* and *Antwine*. Further, we give deference to the trial court findings on the issue of discriminatory intent. *Hernandez v. New York*, — U.S. ——, 111 S.Ct. 1859, 1870, 114 L.Ed.2d 395 (1991).

Judgment affirmed.

PUDLOWSKI, P.J., and STEPHAN, J., concur.