

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101145 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Robert H. Dierker, Jr. |
| LANCE MURRAY, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 15, 2015 |

## Introduction

Appellant Lance Murray ("Murray") appeals from the judgment of the trial court entered after a jury verdict. The jury found Murray guilty on three counts: first-degree robbery, armed criminal action, and first-degree tampering. Before trial began, Murray filed a motion to proceed *pro se*. The trial court granted Murray's motion. On appeal, Murray argues that the trial court erred in granting his motion to proceed *pro se*. Because Murray made a timely, unequivocal, knowing, and intelligent waiver of his right to counsel, we affirm the judgment of the trial court.

## Factual and Procedural History

Murray was charged with first-degree robbery, armed criminal action, and first-degree tampering. The charges stemmed from the robbery of a White Castle at gun point and the subsequent fleeing of the scene in a stolen minivan. Murray received counsel from the Missouri

State Public Defender. On January 31, 2013, counsel entered her appearance on behalf of Murray and began conducting discovery.

On August 15, 2013, Murray filed his first motion to terminate counsel and proceed *pro se*. The criminal-assignment judge interviewed Murray and decided that Murray was not competent to represent himself.[1] On October 15, 2013, Murray filed another motion to proceed *pro se*. The trial court heard that motion on the trial date the following week.

When the trial court asked for background information on Murray's motion to proceed *pro se*, Murray explained that he was dissatisfied with his counsel. Murray believed counsel showed a "lack of interest" every time they met and that counsel did not have Murray's "best interest at heart." Murray stated:

> I know under—I have a right under the 6th Amendment of the United States Constitution to *pro se*, and I believe—and I did—Your Honor, I did carefully consider this. And I believe—and I know I can represent myself. I do not want [counsel] representing me at all.

Murray assured the trial court that "the whole case is prepared. I got all my questions. Everything. Everything I need. Everything is prepared." At the time, Murray had not seen the surveillance video. Murray believed the surveillance video would prove his innocence.

The trial court began examining Murray under oath. Murray reiterated that he wanted to represent himself. Murray said, "I would like to have assistance, because I do want to see the surveillance video [from the robbery]. Due to the fact of me being locked up, I wouldn't be able to show myself the video surveillance. So I would like to have assistance, collateral assistance." The court responded that, while Murray could watch the surveillance video, the court could not guarantee any other assistance: "you either want to go on your own or you don't." Murray

---

[1] In the Twenty-Second Judicial Circuit, the criminal-assignment division (Division 16) assigns cases to trial divisions and rules on certain pretrial matters. Twenty-Second Judicial Circuit Court Rule 6.2.2 (amended Oct. 31, 2008).

2

responded "I will be ready to go." The court warned Murray that he was facing serious charges and that representing himself was a mistake; Murray replied that he did not trust his attorney and he did not want anyone to represent him. Next, the court confirmed that Murray could read and write, and that Murray had a 12th grade education.

The court reviewed the range of punishment for the charged crimes. Murray understood that first-degree robbery and armed criminal action carried potential life sentences, but mistakenly believed that first-degree tampering carried a 20-year sentence, when in fact the maximum sentence is seven years. Murray stated that he understood the judge would sentence him as a prior offender; that armed criminal action carried a minimum sentence of three years in prison; that he would serve at least 85% of a potential robbery sentence; that he would likely receive prison time if he was found guilty; and that his appointed counsel was ready and able to represent him for free. The court warned Murray that technical rules of procedure and evidence applied to him and that he would not receive help from the court or the prosecutor. The court said, "[y]ou understand that if you . . . get fouled up by the rules of procedure, you will be much worse off than if you had a lawyer?" Murray acknowledged that he understood.

The court proceeded to ask Murray about the legal elements of the case:

[MURRAY]: Legal elements?

[COURT]: Right. What does the state have to prove.

[MURRAY]: Beyond a reasonable doubt that I am guilty of this crime, if they come with factual evidence that I am guilty of this crime.

[COURT]: Do you know what kind of evidence they have to present?

[MURRAY]: It's all about really what the jury believes.

[COURT]: Do you know what makes up robbery in the first degree as opposed to robbery in the second degree?

3

[MURRAY]: Nah. Second degree robbery would be based upon—I don't think a gun was used, right? I don't really—

[COURT]: Well, that's one of the issues, Mr. Murray. You know whether the law requires proof of a specific intent or a general intent for any of the charges?

[MURRAY]: No.

The court explained the hazards of mishandling procedural issues, such as objections. Murray responded:

I won't use objections the wrong way, because there are certain things—some things is people—people will say, they really don't make sense. I'll let—certain things I will let just pass me by anyway, because some things, if I don't understand, the jury don't understand them. If they're using big words, big old fancy words, God can't understand. Believe me, most likely he don't understand either.

Murray believed he was competent. The court warned: "I know you have a high estimate of your ability, but, you know, it's kind of like a doctor taking out his own appendix, Mr. Murray. . . . It may not work." The court explained that rules of evidence could keep Murray's evidence out, that certain issues would be lost if not raised, and that Murray's actions in front of the jury could prejudice his case. Murray said he understood the dangers and still wanted to represent himself.

The court asked if Murray had any defenses. Murray responded, "[a]ny defenses? I got—I got a lot of defense, for real. Lot of defense. I got my paperwork ready." The court inquired about Murray's mental health, to which Murray responded: "No, I been to college and everything. I detect—did a couple of good things. I'm a welder in town." Murray gave a long response including his use of drugs, which he does not do anymore because God made him better. The court warned that Murray would not be able to come back to court and complain that his lawyer was inadequate. The court asked:

[COURT]: For the last time, I strongly advise you against it, but do you want to represent yourself?

4

[MURRAY]: Yes, I will.

[COURT]: The problem I have, you know, Mr. Murray, is similar to the problem that [the criminal-assignment judge] had. I'm concerned about your ability to understand the rules of procedure. . . . [I]f I do let you represent yourself, we're going to follow certain rules. One of the rules is that I'm going to do all the questioning of the jurors for jury selection. I'll give you and the prosecutor 10 minutes a piece to talk to them, to ask them any questions you want to ask them. . . . Otherwise, we're going to proceed in strict accordance with the rules.

The court asked if Murray had jury instructions. Murray said he would "let [the court] do that." The court again warned:

Well, that's another issue, because that's—there are some jury instructions that the court gives automatically. There are others that only the defendant can ask for, or that the state asks for and the defendant objects. So if you don't know anything about jury instructions, you've got another problem.

After a brief recess for Murray to watch the surveillance video, the court accepted Murray's signed memorandum waiving his right to counsel. After Murray indicated he had no questions about the waiver, Murray confirmed that he still wished to represent himself. The court found that Murray was fully informed of and understood his right to assistance of counsel, and that Murray was literate and mentally competent. The court also found Murray "knowingly, voluntarily, and intelligently" waived his right to counsel with full knowledge of the consequences and the effect of the waiver. Murray proceeded to trial *pro se*, with his original counsel retained as "standby counsel." Standby counsel sat inside the bar in the event Murray had a question, but not at counsel table.

After trial, the jury convicted Murray on all counts: first-degree robbery, armed criminal action, and first-degree tampering. The trial court sentenced Murray to fifteen years, three years, and two years, respectively, in prison. The three sentences were run consecutively to each other, for a total of twenty years in prison. This appeal follows.

5

## Point on Appeal

In his sole point on appeal, Murray contends that the trial court erred in allowing Murray to represent himself *pro se* during trial. Murray argues that the court did not adequately advise him about possible defenses, and did not overrule his request despite demonstrating fundamental misunderstandings about the trial process.

## Standard of Review

A constitutional claim must be made at the first opportunity to be preserved for review. State v. Fassero, 256 S.W.3d 109, 117 (Mo. banc 2008). While no objection was raised during trial, we cannot expect Murray to file an objection to his own motion in order to preserve this issue for appeal. After trial, standby counsel filed a motion for new trial alleging the trial court erred in allowing Murray to proceed *pro se*. Since standby counsel raised the issue in the motion for new trial, this was the first opportunity. Thus, the issue was preserved. Appellate review of the factors constituting a valid waiver of the right to counsel is *de novo*. State v. Johnson, 328 S.W.3d 385, 394 (Mo. App. E.D. 2010) (citing United States v. Kind, 194 F.3d 900, 903–904 (8th Cir. 1999)).

## Discussion

The Sixth Amendment right to counsel "implicitly embodies a correlative right to dispense with a lawyer's help." Faretta v. California, 422 U.S. 806, 814 (1975) (internal quotation marks omitted). This right applies to the states through the Due Process Clause of the Fourteenth Amendment. State v. Black, 223 S.W.3d 149, 153 (Mo. banc 2007). A trial court has no discretion to force an attorney upon a defendant who validly waives the right to counsel. Id. "The defendant's knowledge of all relevant facts need not appear in the trial record to support a finding that the waiver of counsel was proper." State v. Garth, 352 S.W.3d 644, 654

6

(Mo. App. E.D. 2011). A valid waiver is timely, unequivocal, knowing, and intelligent. Black, 223 S.W.3d at 153.

## I.    Murray's waiver was timely.

A defendant must assert the right to proceed *pro se* in a timely manner. Black, 223 S.W.3d at 153 (citing United States v. Brown, 744 F.2d 905, 908 (2d Cir. 1984)). Murray's trial date was October 21, 2013. Murray began filing documents on his own on March 27, 2013. Murray then filed his first motion to proceed *pro se* on August 15, 2013. After the first motion was denied, Murray again asserted his right to proceed *pro se* in a second motion on October 15, 2013. Because Murray repeatedly asserted his right to proceed *pro se* months before trial, his waiver was timely.

## II.    Waiver was unequivocal.

An ambiguous request to proceed *pro se* is not sufficient because of the possibility that the defendant will argue on appeal that the right to counsel was denied. State v. Hampton, 959 S.W.2d 444, 447 (Mo. banc 1997). Whether the court allows or does not allow a defendant to represent himself, the defendant will likely challenge either decision on appeal; this likelihood underscores the importance of requiring an explicit and unequivocal waiver. Black, 223 S.W.3d at 153.

Murray repeatedly and unequivocally asserted his right to proceed *pro se* during the trial court's questioning. Murray believed counsel did not have his "best interest at heart." Murray stated he had a "right under the 6th Amendment of the United States Constitution to *pro se* . . . I did carefully consider this." Murray said, "I do not want [trial counsel] representing me at all." On numerous occasions, the court asked Murray directly if he *still* wanted to represent himself, and each time Murray responded that he did. Thus, Murray's waiver was unequivocal.

7

**III.   Murray's waiver was knowing and intelligent.**

Whether to allow a criminal defendant to waive the right to counsel is one of the most sensitive rulings a trial court must make. Black, 223 S.W.3d at 155. A criminal defendant will likely appeal either decision. Id. Whether a defendant's waiver is made knowingly or intelligently depends on the particular facts and circumstances of the case. Id. at 154. This test considers the background, experience, and conduct of the defendant. Id.

While there is no "rigid procedure" or "script" to follow, a trial court should explore certain areas of inquiry to ensure the waiver is knowing and intelligent. Id. at 155. "First, a trial court should inquire into the defendant's capacity to make an intelligent decision and his knowledge of his own situation." Id. at 156. Second, a trial court should make certain that the defendant understands the possible penalties if convicted. Id. Third, a trial court should be sure that the defendant understands exactly what rights and privileges the defendant is waiving and the dangers associated with waiving constitutional rights. Id. These areas of inquiry are discussed in turn.

A.   Murray's capacity to make an intelligent decision and knowledge of the situation.

It is important to remember that waiving counsel is the defendant's choice. See Faretta, 422 U.S. at 834. The defendant's "technical legal knowledge" of the law or procedure is *not* relevant to the assessment of whether the defendant knowingly exercised the right to defend himself. Id. at 836. It is error for a trial court to reject defendant's waiver simply because the court felt an attorney could do a better job. Black, 222 S.W.3d at 155. Rather, the court should ensure the defendant (1) is not acting under duress, (2) does not suffer from mental incapacity, (3) is literate, and (4) is "minimally familiar" with the trial process, including possible defenses, the different phases of trial, objection procedure, and the elements of the crime charged. Id. at 156.

8

First, the record does not indicate Murray was under any duress when he waived his right to counsel. The trial court asked Murray directly: "[h]as anybody offered you any promise or consideration or in any way force [*sic*] you to act as your own lawyer?" Murray's response was negative. Nothing in the record suggests any duress.

Second, the record shows Murray did not suffer from any mental incapacity. A mental incapacity that allows a court to deny self-representation occurs when defendants "suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." Indiana v. Edwards, 554 U.S. 164, 178 (2008). The court specifically asked Murray if he suffered from "any problems with [his] mental health?" Murray responded that he had not. Murray admitted that he had previously "been on drugs" but also that he was no longer using drugs. No evidence suggests Murray was using drugs or intoxicated while attempting to waive his right to counsel. Nothing else in the record suggests "severe mental illness."

Third, the trial court confirmed that Murray was literate. The court asked if Murray could read and write. Murray stated he could. Murray confirmed he had graduated the 12th grade. Further, the trial court was aware of the numerous filings Murray made before trial that indicated Murray could read and write. Therefore, the record reflects that Murray was literate.

Fourth, the record indicates Murray was "minimally familiar" with the trial process. This is a low bar because we are not concerned with Murray's technical knowledge of the law. See Faretta, 422 U.S. at 836. The trial court asked about potential defenses; Murray responded, "Any defenses? I got—I got a lot of defense, for real. Lot of defense. I got my paperwork ready." Elsewhere in the record, Murray mentioned his plans to show the jury surveillance video of the incident. Murray believed the video would prove he was misidentified. Further, Murray believed he would "be able to catch everybody lying when we go to trial." Murray was at least

9

"minimally familiar" with potential defenses. The trial court was not required to give "detailed advice" about possible defenses; the court was not Murray's counsel, but an impartial arbitrator. See State v. Garth, 352 S.W.3d 644, 654 (Mo. App. E.D. 2011).

Similarly, the record indicates Murray was at least "minimally familiar" with the different phases of trial, objections, and the elements of the crimes charged. Murray knew that a jury had to be selected. He knew the State had to prove "[b]eyond a reasonable doubt that [he was] guilty of [the] crime." Murray was unclear as to the difference between first- and second-degree robbery and the difference between general- and specific-intent crimes, but he also indicated a strategy for making objections at trial:

> I won't use objections the wrong way, because there are certain things . . . people will say, they really don't make sense. I'll let—certain things I will let just pass me by anyway, because some things, if I don't understand, the jury don't understand them. If they're using big words, big old fancy words, God can't understand. Believe me, most likely he don't understand either.

The record reflects that Murray had minimal familiarity with the trial process and a strategy for making (or not making) objections. Therefore, Murray had the capacity to make an intelligent decision and knowledge of his own situation.

B.    Murray's understanding of possible penalties if convicted.

Murray understood the possible penalties if he was convicted. The trial court informed Murray that he was charged with first-degree robbery, armed criminal action ("ACA"), and first-degree tampering. Murray understood. Murray, without help from the court, knew that both first-degree robbery and ACA carried potential life sentences. Murray overestimated the punishment on first-degree tampering, which he believed carried a twenty-year sentence rather than its actual seven-year sentence. The court informed Murray that the court would sentence him, not the jury, because Murray was a prior offender. The court reminded Murray of the mandatory-minimum prison sentences: three years if convicted for ACA and 85% of any robbery

10

prison sentence. Murray indicated he was aware of all of these facts. Hence, Murray understood the possible penalties he would suffer if convicted.

### C. Murray's understanding of exactly what rights and privileges he was waiving, and the dangers associated with waiving constitutional rights.

The court should first ensure that the defendant understands that he has a right to counsel, including appointed counsel if indigent. Black, 223 S.W.3d at 156. If the defendant chooses to continue, the court should advise generally that it is a mistake to proceed without a lawyer. Id. Then, the court should warn the defendant specifically about the dangers and repercussions of the decision to waive counsel. Id. A trial court cannot force an attorney upon a defendant who validly waives the right to counsel. Id. at 153.

The trial court informed Murray that "you have the right to an attorney represent you, and you understand that [appointed counsel] would represent you free of charge?" The trial court repeatedly and directly advised Murray that proceeding *pro se* was a bad idea. The court remarked, "it's kind of like a doctor taking out his own appendix, Mr. Murray. . . . It may not work." The court warned Murray that certain objections and issues would be lost if not raised. The court stressed that Murray was "likely to be convicted without a lawyer." Murray repeatedly ignored those warnings. The trial court told Murray, "You understand that acting as your own attorney, you will be opposed by an experienced prosecutor, and neither the court nor the prosecutor will help you during the trial?" The trial court warned about the failure to follow procedure: "You understand that if you disrupt the trial or get fouled up by the rules of procedure, you will be much worse off than if you had a lawyer?" The court insisted it could not "operate as a coach." The court stressed that it was nearly impossible to negotiate a plea bargain without a lawyer. The court cautioned Murray of the problems he would face related to jury selection, presenting evidence, objecting to evidence, preserving issues, and submitting jury

11

instructions. Finally, the court said, "[f]or the last time, I strongly advise you against it, but do you want to represent yourself?" Murray maintained his insistence on representing himself.

The trial court inquired into Murray's capacity to make an intelligent decision and his knowledge of his own situation, Murray's understanding of the possible penalties if convicted, and the rights, privileges, and dangers of waiving the right to counsel. Accordingly, Murray's waiver of his right to counsel was voluntary and intelligent. Because the waiver was also timely and unequivocal, the trial judge did not err in granting Murray's motion to proceed *pro se*. Point denied.

Conclusion

The decision of the trial court is affirmed.

KURT S. ODENWALD, Judge

Sherri B. Sullivan, P.J., concurs.
Patricia L. Cohen, J., concurs.