

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, ) | |
| ) | |
| Respondent, ) | |
| ) | WD77979 |
| v. ) | |
| ) | OPINION FILED: |
| ) | March 15, 2016 |
| GABRIEL L. LEONARD, ) | |
| ) | |
| Appellant. ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable J. Dale Youngs, Judge**

**Before Division Two:** Cynthia L. Martin, Presiding Judge, and
Mark D. Pfeiffer and Karen King Mitchell, Judges

Gabriel Leonard appeals his convictions, following a jury trial, of the class B felony of kidnapping, § 565.110,[1] the class B felony of first-degree burglary, § 569.160, and the class C felony of second-degree domestic assault, § 565.073, for which he was sentenced to a total of twenty-four years' imprisonment. On appeal, Leonard challenges the sufficiency of the evidence to support his convictions, the trial court's decision to allow Leonard to represent himself at trial,

---

[1] All statutory references are to the Revised Statutes of Missouri 2000, as updated through the 2012 Cumulative Supplement, unless otherwise noted.

and the court's failure to instruct the jury, *sua sponte*, on lesser-included offenses. Finding no error, we affirm.

## Background

Leonard and Victim dated for approximately one and a half years before ending their relationship. Shortly after their relationship ended, in May of 2012, Victim's home (where she and Leonard had resided together during their relationship) caught fire, and she received money from an insurance policy to cover the damage.

Starting on January 4, 2013, Victim began receiving text messages from Leonard, begging Victim to talk to him. Among the messages were statements from Leonard such as:

- "It doesn't matter who you move in, you're endangering lives right now";

- "Sweetie, it's out of my hands. Now whoever gets hurt is on you. I wanted to make peace. I was going to stop by to reason with you, but you keep making matters worse for both of us, dumb ass";

- "I'm saying you're getting a visit sooner or later so even my bro has to be cautious. . . . You're going to be the blame cause you knew";

- "I've been coming over and watching out ready to fucking defend you. Wake up. . . . I hate you fucking other people and leaving us both the danger. That's double pain for me. Why are you giving your body to someone else? All the love we've made and I'm sure there's more";

- "Why are you giving your body to someone else? All the love we made and now it's not better so don't be stupid, Babe. He's not going to protect you or be there for you in the worst of times like me. You're just running right now making things worse. You know

2

I'm not dealing, sexting anyone else. Why would you risk us by bringing another dude into the situation";

- "You may want to turn a blind eye but I didn't want you hurt. Get rid of whoever you are dating and I'll be there tonight. We're long from over and no, I can't stop this shit";

- "The more I see cars over there, the more pissed I get."

Shortly before 6:00 a.m. on January 6, 2013, Victim awoke to use the restroom. When she glanced out of the bathroom window, she saw Leonard's vehicle parked in her driveway and became frightened. Victim headed back toward her bedroom to retrieve her glasses and cell phone, but, as she passed a second-floor window outside her bedroom, Leonard's arms reached through the curtains and grabbed her. Then, using Victim's body and the window frame, Leonard pulled himself into the house. Victim was "terrified," and she struggled with Leonard, but he "held [her] down and put his hands over [her] mouth," causing her to hit her head and strain her neck. Victim gasped, "Please, I can't breathe. Stop. You're killing me." Leonard replied, "I know," or "something to that effect." Though Victim continued to fight, Leonard advised her that she "should just accept what was happening." He then picked Victim up with one arm and carried her down to the basement, where Leonard forced Victim, at gunpoint, into a large dog kennel. Leonard then padlocked the kennel door with two padlocks that Victim had never seen before.

Leonard began looking through Victim's cell phone to see who she had been calling and texting. He also demanded bank information, such as Victim's account numbers and passwords. For the next thirty minutes to one hour, Leonard repeatedly pointed the gun at Victim, kicked the kennel, and struck the kennel with the gun. He also demanded money and would occasionally go

3

upstairs to rifle through Victim's paperwork; Leonard had previously demanded $25,000 from the insurance settlement Victim received for her house fire.

During one of Leonard's trips upstairs, Victim managed to take apart one corner of the kennel and squeeze herself through a small opening. She then fled the basement and ran to her neighbor's house for help. Victim's neighbor let her in and contacted 911, but Leonard left Victim's home before the police arrived.

After the police arrived, they cleared Victim's home and then escorted her over to retrieve her glasses and some shoes. The home appeared to have been ransacked. While in her home, Victim found her cell phone, and shortly thereafter, she received a call from Leonard. Leonard told Victim, "I need that money. I got people looking for that money." The police also discovered an orange ladder lying on the ground at the rear of the residence; Victim indicated that the ladder was not hers and that it had not been there before that day.

Leonard was eventually apprehended and charged, as a prior offender, with kidnapping, first-degree burglary, second-degree domestic assault, and unlawful use of a weapon. He was initially represented by an assistant public defender, but Leonard disagreed with the manner in which his counsel was handling his case, so he filed several motions, first seeking to dismiss and replace his current counsel, and then to dismiss counsel altogether and proceed pro se.

The trial court held an extensive hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), wherein it questioned Leonard about his request to proceed pro se and advised him of the dangers of self-representation, even going so far as to suggest that "this is[,] of probably all the mistakes that you've made in your life, this might be number one." The trial court indicated to Leonard that he was likely to be convicted if he chose to represent himself, but Leonard nevertheless insisted, "unequivocally," that it was his desire to represent himself. The trial court

4

questioned Leonard at length about his education and understanding of the legal process and then concluded that Leonard had "knowingly, voluntarily, and intelligently waived his right to b[e] represented by counsel in this proceeding with the full knowledge and understanding of his rights and an understanding of the consequences and effective waiver of that right."

At trial, Leonard presented testimony from a friend, who indicated that Leonard had been at the friend's home during the relevant time frame, specifically between the hours of 6:30 and 7:00 a.m. on January 6, 2013.

The jury found Leonard guilty as charged. After trial, Leonard was able to retain counsel for the sole purpose of filing a motion for new trial and sentencing. In response to the motion, the trial court entered a judgment of acquittal on the unlawful use of a weapon charge, finding that the State failed to present sufficient evidence demonstrating that the gun was readily capable of lethal use. The trial court denied the motion in all other respects, and sentenced Leonard to consecutive terms of twelve years for kidnapping and burglary, and a concurrent term of seven years for domestic assault, for a total sentence of twenty-four years' imprisonment. Leonard appeals.[2]

**Analysis**

Leonard ostensibly raises three points on appeal. Each point, however, is both deficient and multifarious. In his first point, Leonard challenges the sufficiency of the evidence to support *each* of his three convictions. The point fails to identify "why the legal reasons, in the context of the case, support the claim[s] of reversible error" insofar as Leonard's point fails to identify in what way the State's evidence was insufficient—i.e., what elements lacked evidentiary support. *See* Rule 84.04(d)(1)[3] ("The point shall be in substantially the following form: 'The trial court

_____

[2] Further facts will be discussed within the analysis as relevant to the issues on appeal.
[3] All rule references are to the Missouri Supreme Court Rules (2015).

5

erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*].'"). Additionally, in challenging all three convictions in a single point, Leonard's first point is multifarious in violation of Rule 84.04(d) insofar as it challenges multiple rulings by the trial court. "Multiple claims of error in one point relied on renders the point multifarious and as such is a violation of Rule 84.04, made applicable to briefs in criminal appeals by Rule 30.06(c)." *State v. Garrison*, 276 S.W.3d 372, 378 n.4 (Mo. App. S.D. 2009). "Generally, multifarious points preserve nothing for appellate review and are ordinarily subject to dismissal." *Id*.

Leonard's second point suffers from the same flaws. In his second point, he challenges both the trial court's granting of his motion to proceed pro se and its denial of his subsequent request to reappoint counsel. As with the first point, Leonard's second point fails to identify why the legal reasons, in the context of the case, support his claims of reversible error insofar as he fails to identify any facts supporting his claim that his waiver of the right to counsel was unknowing and unintelligent. Additionally, because he challenges two distinct rulings of the trial court, his point is also multifarious. *Id*.

Leonard's third point also suffers from the same defects. In his third point, he claims that the trial court erred in failing to *sua sponte* instruct the jury on lesser-included offenses for each of his three convictions. Yet, as with his first two points, he fails to direct this court to any facts supporting his claims of error. And, as with the other two points, he again raises multiple claims of error within a single point relied on.

Given the multiple violations of Rule 84.04(d), it is within our discretion to dismiss Leonard's appeal. The State, however, has not challenged any of these deficiencies, and "we

6

prefer to decide cases on the merits where [an] appellant's argument is readily understandable—as is the case here." *State v. Robinson*, 454 S.W.3d 428, 437 n.6 (Mo. App. W.D. 2015). Accordingly, we will exercise our discretion to review Leonard's points on appeal despite the violations of Rule 84.04(d).

**A.  The evidence was sufficient to support each of Leonard's convictions.**

"An appellate court's review of the sufficiency of the evidence to support a criminal conviction is limited to determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *State v. Porter*, 439 S.W.3d 208, 211 (Mo. banc 2014). "All evidence and inferences favorable to the State are accepted as true, and all evidence and inference[s] to the contrary are rejected." *Id*. The question is not "whether the [c]ourt believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (internal quotations omitted).

**1.  Kidnapping**

"A person commits the crime of kidnapping if he . . . unlawfully confines another without . . . her consent for a substantial period, for the purpose of . . . terrorizing the victim . . . ." § 565.110.1(5).  Accordingly, for the State's evidence to be sufficient, it needed to show that Leonard:  (1) unlawfully confined Victim; (2) without her consent; (3) for a substantial period; and (4) for the purpose of terrorizing her.

Leonard does not challenge the first three elements; rather, his challenge is directed at the fourth element—that his purpose was to terrorize Victim.  Relying on *State v. Keeler*, 856 S.W.2d 928 (Mo. App. S.D. 1993), Leonard argues that the State failed to present *any* evidence

7

regarding his purpose in confining Victim, let alone that it was to terrorize her. Leonard's reliance on *Keeler*, however, is misplaced, and his argument is without merit.

In *Keeler*, the defendant pulled his car alongside a nine-year-old girl walking on the sidewalk, opened his car door, and commanded the girl to get in. *Keeler*, 856 S.W.2d at 929. The girl refused and ran away. *Id.* The defendant was subsequently charged with and convicted of attempted kidnapping. *Id.* at 929-30. He argued on appeal that the evidence was insufficient to support his conviction insofar as the evidence failed to demonstrate any purpose other than to have the girl enter his car; in other words, the evidence failed to prove that he had a purpose to terrorize the victim. *Id.* at 930. The Southern District agreed, noting that, though the defendant's acts "provide[d] evidence of his purpose to get [the child] into the car . . . [t]he question remains: For what purpose [did he want her in the car]?" *Id.* at 930, 931. The court then held: "Based on the record before us, to say that the defendant's purpose in getting [the child] into his car was to commit a felony, to inflict physical injury on her, or to terrorize her or another is nothing but sheer speculation." *Id.* at 931.

Unlike the facts in *Keeler*, Leonard did not merely attempt, unsuccessfully, to confine Victim; he, in fact, confined her in a dog kennel in her own home, after sneaking into a window, nearly suffocating Victim, dragging her down the stairs, and threatening her with a gun. And he took all of these actions after sending Victim numerous threatening text messages indicating that lives were in danger and someone was going to get seriously hurt. Confining someone while simultaneously threatening a loss of life or physical injury is sufficient to demonstrate a purpose to terrorize. *See, e.g., State v. Ross*, 857 S.W.2d 375, 377 (Mo. App. W.D. 1993); *State v. Van Vleck*, 805 S.W.2d 297, 299 (Mo. App. E.D. 1991); *State v. Vitiello*, 791 S.W.2d 837, 839 (Mo. App. W.D. 1990).

8

Leonard argues that a purpose to terrorize must be equivalent to "terrorism," which he suggests requires some sort of government or political involvement. This argument is absurd. As we have previously held, "Terrorizing is defined as, 'To impress with terror; To coerce by intimidation.'" *Ross*, 857 S.W.2d at 377 (quoting Webster's Collegiate Dictionary (5th ed. 1942)). Clearly, Leonard's acts of invading Victim's home and forcing her into a dog kennel at gunpoint, after threatening a loss of life or physical harm, while simultaneously demanding money, were sufficient to demonstrate his purpose to coerce Victim by intimidation.

This aspect of Point I is denied.

## 2. First-degree burglary

"A person commits the crime of burglary in the first degree if he knowingly enters unlawfully . . . in a building or inhabitable structure for the purpose of committing a crime therein, and when [doing so], . . . [t]here is present in the structure another person who is not a participant in the crime." § 569.160.1. Here, the State charged that Leonard's purpose in entering Victim's home was to commit stealing therein. Leonard argues only that the evidence was insufficient to demonstrate that his purpose in entering Victim's home was to steal.

The crux of Leonard's argument is that the evidence was insufficient to demonstrate his intent to steal because he did not, in fact, steal anything from Victim's residence. He also argues that "the far more reasonable inference from the evidence" was that he "entered the home because he was angry about his failed relationship with [Victim]." Both of these arguments fail.

First, "[i]t is unnecessary in a burglary prosecution to prove more than the intent to commit a crime in the building. Consummation of the intent is unnecessary." *State v. Spencer*, 671 S.W.2d 433, 435 (Mo. App. W.D. 1984). "'If a person breaks and enters a house intending to steal, he is not exonerated from the commission of burglary merely because he did not steal

9

anything or because he was frightened away before he carried out his intent.'" *State v. Farris*, 243 S.W.2d 983, 986 (Mo. 1951) (quoting 9 AM. JUR. *Burglary*, § 27).

Second, the fact that there may be a second reasonable inference—distinct from one supporting guilt—does not negate the existing inference supporting guilt. And our standard of review mandates that we disregard all inferences contrary to the verdict. Thus, even if the evidence supports an inference that Leonard entered Victim's home out of anger over a failed relationship, that inference does not negate the evidence, including comments made before entering and while in Victim's home regarding insurance proceeds, and inferences demonstrating that his true purpose in entering Victim's home was to steal money from her.

Accordingly, this aspect of Point I is also denied.

### 3. Second-degree domestic assault

"A person commits the crime of domestic assault in the second degree if the act involves a family or household member, . . . and he . . . knowingly causes physical injury to such family or household member by any means, including but not limited to . . . choking or strangulation . . . ." § 565.073.1(1). Here, Leonard argues that the State's evidence was insufficient to demonstrate that Victim suffered any injury from his effort to suffocate her. We disagree.

For purposes of § 565.073, "'[p]hysical injury' means physical pain, illness, or any impairment of physical condition." § 556.061(20). Victim testified that, after Leonard first entered the home, "he held [her] down and put his hands over [her] mouth." She also testified that she suffered pain the next day as the result of her "trying to get up off the ground." She indicated that, when Leonard knocked her to the ground, she "hit [her] head and strained [her]

10

neck." The evidence was plainly sufficient to demonstrate that Victim suffered physical injury from Leonard's attempt to suffocate her.

This aspect of Point I is also denied.

**B. Leonard knowingly, voluntarily, and intelligently waived his right to counsel.**

In his second point on appeal, Leonard argues that the trial court erred in both granting his request to proceed pro se and denying his later request for reappointment of the public defender.

"Appellate review of the factors constituting a valid waiver of the right to counsel is *de novo*." *State v. Murray*, 469 S.W.3d 921, 926 (Mo. App. E.D. 2015). But because "[a] trial court is not categorically required to allow a criminal defendant to withdraw a previously entered, valid waiver of counsel at any time he so desires," we review a trial court's refusal to allow such a withdrawal for an abuse of discretion. *State v. Garth*, 352 S.W.3d 644, 655-56 (Mo. App. E.D. 2011).

**1. Leonard validly waived his right to counsel.**

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta*, 422 U.S. at 819. And, "[a]lthough not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment." *Id.* "It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id.* at 834. "And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

"When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Id*. at 835. "For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Id*. (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938)). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id*. (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)).

"There are four requirements for a defendant seeking to waive his right to counsel and proceed pro se." *State v. Black*, 223 S.W.3d 149, 153 (Mo. banc 2007). "A defendant's invocation of the right must be made unequivocally and in a timely manner, and the corresponding waiver of counsel must be knowing and intelligent." *Id*.

Here, Leonard challenges only the knowing and intelligent nature of his waiver. "Whether a defendant's waiver is made knowingly or intelligently depends on the particular facts and circumstances of the case." *Murray*, 469 S.W.3d at 926. "This test considers the background, experience, and conduct of the defendant." *Id*. "While there is no 'rigid procedure' or 'script' to follow, a trial court should explore certain areas of inquiry to ensure the waiver is knowing and intelligent." *Id*. at 927 (quoting *Black*, 223 S.W.3d at 155). "First, a trial court should inquire into the defendant's capacity to make an intelligent decision and his knowledge of his own situation." *Black*, 223 S.W.3d at 156. "Second, a trial court should make certain that the defendant understands the possible penalties if convicted." *Murray*, 469 S.W.3d at 927. "Third, a trial court should be sure that the defendant understands exactly what rights and

12

privileges the defendant is waiving and the dangers associated with waiving constitutional rights." *Id.*

Under § 600.051.1, before a court may accept a waiver of counsel from a criminal defendant, the court must advise the defendant of the following: (1) the nature of the charges; (2) the defendant's right to a trial on the charges and the right to a trial by jury; (3) the range of punishment for each charge; (4) that any recommendations by the prosecutor are not binding on the judge and may be rejected; (5) that, if the defendant is found guilty, the judge is most likely to impose a sentence of confinement; and (6) that, if indigent, the defendant has a right to request the judge to appoint counsel to assist the defendant.[4]

Here, the trial court conducted an extensive *Faretta* hearing spanning thirty-five pages of transcript. The hearing covered each of the topics identified in § 600.051.1, as well as Leonard's mental capacity, level of education, and understanding of the legal process. The trial court discussed all of Leonard's rights and privileges associated with the assistance of counsel that he would be waiving in choosing to represent himself. And the trial court repeatedly advised Leonard of the dangers of self-representation and that the trial court believed Leonard to be making a mistake in seeking to represent himself.

Leonard acknowledges these facts but nevertheless claims that "there was a clear deficiency in this *Faretta* hearing involving [his] understanding of the elements of the charges, defenses, and lesser included offenses." In support of his argument, he relies upon two Eighth Circuit cases: *Wilkins v. Bowersox*, 145 F.3d 1006 (8th Cir. 1998), and *Shafer v. Bowersox*, 329 F.3d 637 (8th Cir. 2003).

---

[4] Leonard filed a written waiver of counsel pursuant to § 600.051. He raises no challenge to the waiver under the statute.

To begin, both *Wilkins* and *Shafer* are distinguishable insofar as they both concerned defendants who waived their rights not only to counsel but also to trial in that both defendants pled guilty. *Wilkins*, 145 F.3d at 1008; *Shafer,* 329 F.3d at 640. Thus, the required inquiries of the defendants necessarily needed to be more thorough to cover not only the right to counsel but also the rights associated with trial. Additionally, in both *Wilkins* and *Shafer*, the plea courts failed to conduct thorough and searching inquiries of the defendants regarding their waivers. *Wilkins*, 145 F.3d at 1012 ("The court's colloquy with Wilkins regarding his decision to waive counsel consisted predominantly of leading questions that failed to allow Wilkins to articulate his reasoning process."); *Shafer*, 329 F.3d at 647 ("The record reveals that the trial court asked few questions in this capital case with respect to Shafer's waiver of counsel for the guilt phase and did not fully inform him about his possible options or the choices he faced."). And, finally, in both cases, the lower courts erroneously relied solely on the fact that the defendants had been deemed competent for trial in determining that their waivers of counsel and trial were constitutionally valid. *Wilkins*, 145 F.3d at 1013 ("The state trial court erroneously believed that its previous finding that Wilkins was competent to stand trial was alone sufficient to mandate a conclusion that Wilkins'[s] waiver of counsel was valid."); *Shafer*, 329 F.3d at 650 (noting that the state court erroneously relied upon the defendant's competency to proceed as demonstrating that his waivers of counsel and trial were valid).

During Leonard's hearing, on the other hand, the trial court conducted a thorough and searching inquiry with open-ended questions, specifically seeking Leonard's understanding of various topics, including those about which he now complains. For example, the trial court asked Leonard, "Are you familiar with the elements of the case for kidnapping against you?" Leonard responded, "I'm still in the middle of research." Leonard made the same representation

14

regarding each of the counts against him—he did not know all of the elements, but was still researching them. The trial court then asked, "Do you believe that if you're granted a continuance in the case that you would be able to come to some understanding of what the various elements of these offenses are?" Leonard responded, "Yes, Your Honor." Following the hearing, the trial court granted Leonard a 90-day continuance. Regarding defenses, Leonard had already indicated to the court that he intended to present an alibi defense. Nevertheless, the trial court inquired as to whether Leonard was prepared to put on that defense, and he indicated that he was.[5] Finally, the court questioned Leonard regarding lesser-included offenses: "Do you know what a lesser included offense is?" Leonard responded, "Yes, Your Honor." Leonard then explained that it was essentially a lesser charge. Leonard also indicated his understanding that "there are certain instructions that are only properly given if they are requested either by [defendant] or by the State."[6] We fail to see any deficiency in the trial court's *Faretta* hearing.

A defendant's "technical legal knowledge, as such, [i]s not relevant to an assessment of his knowing exercise of the right to defend himself." *Faretta*, 422 U.S. at 836; *see also Godinez v. Moran*, 509 U.S. 389, 399 (1993) ("[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself."). "[T]he right to waive counsel is the right knowingly to proceed in ignorance . . . into the labyrinth of the law without the assistance of a trained guide." *State v. Shafer*, 969 S.W.2d 719, 728-29 (Mo. banc 1998).

Accordingly, this aspect of Point II is denied.

---

[5] Even if the trial court had not made this inquiry, we cannot say that Leonard's *Faretta* hearing would have been deficient. *See State v. Garth*, 352 S.W.3d 644, 653 (Mo. App. E.D. 2011) ("Although possible defenses are listed among the things the trial court should inquire into the defendant's knowledge about, . . . the singular failure to advise the defendant of possible defense to the crime with which he is charged [does not] merit[] reversal.").

[6] Later, during a pre-trial conference, the court directly advised Leonard of his right to request lesser-included offense instructions.

**2. The trial court did not plainly err in refusing to reappoint the public defender.**

Two days before trial was scheduled to begin, Leonard filed a motion seeking a continuance. After the trial court denied Leonard's continuance request, Leonard advised the court: "at this point in time due to the denial of my Motion for a Continuance, I stand mute." Leonard then refused to speak or respond to the court in any way. Accordingly, the court questioned whether Leonard intended to remain mute throughout the proceedings, and as part of that inquiry the court exhaustively discussed every procedural aspect of the criminal trial that Leonard would not be participating in if he chose to remain mute throughout. The court then asked, "Is it your stated intention from this point forward until the end of the case, whatever that means, to say nothing more?" Leonard responded, "It is my intention to stand mute with the request that the public defender be reassigned to my case." The court advised Leonard: "Well, that is at best an ironic argument for you to make in light of the allegations that you have made regarding the Public Defender's Office over the course of the last year and half." The court denied Leonard's motion, stating: "Mr. Leonard, with all respect I think you're just jerking me around and I understand your stated purpose for your request and I'll let the record speak[] for itself as to how the request [ha]s been put forward and the timing of it and, as I said, to some degree, the irony of it."

"A trial court is not categorically required to allow a criminal defendant to withdraw a previously entered, valid waiver of counsel at any time he so desires." *Garth*, 352 S.W.3d at 655. "The right to self-representation is intended to ensure a defendant's right to a full and fair trial and is not intended to enable the defendant to avoid or delay the trial for any unjustifiable reason." *State v. Sharkey*, 821 S.W.2d 544, 546 (Mo. App. E.D. 1991). Ordinarily, "it is within the trial court's discretion to deny motions filed by a defendant which are calculated to delay trial, as well as to deny a defendant's assertions that his constitutional rights were violated when

16

such assertions are made simply to hinder his prosecution." *State v. Richardson*, 304 S.W.3d 280, 289 (Mo. App. S.D. 2010). Here, however, because Leonard did not include this claim of error in his motion for new trial, it is not preserved for our review. *See* Rule 29.11(d) ("In jury-tried cases, allegations of error to be preserved for appellate review must be included in a motion for new trial . . . ."). Thus, he is—at best—entitled to plain error review but only if the claimed error is "evident, obvious, and clear," such that a manifest injustice or miscarriage of justice will result if the error stands uncorrected. *State v. Williams*, 465 S.W.3d 516, 519 (Mo. App. W.D. 2015). We find no plain error.

Despite his claims to the contrary, Leonard's case is very similar to the facts of *Richardson*. In *Richardson*, the defendant "had been representing himself on and off throughout [the] proceedings and had already had two months in which to prepare for trial." 304 S.W.3d at 289. And despite "having been extensively warned about proceeding pro se, [the defendant], who had completed three years of college, did not request to have counsel appointed until after his last request for a continuance was denied." *Id*. Just like Leonard, the defendant in *Richardson* "read and signed a written waiver form which advised him of the issues he might face in choosing to represent himself"; "the trial court orally discussed the perils of self representation . . . at length in open court"; the defendant was advised to seek representation; and "the record . . . [wa]s replete with testimony from [the defendant] about his disdain for and distrust of the [Missouri State Public Defender], . . . his lack of cooperation with the various attorneys that have represented him; his repeated pro se requests for continuances . . . ; and his repeated assertions that he desired to represent himself." *Id*. at 290. And just like Leonard, the defendant in *Richardson* "requested another continuance [a mere four days before trial] to continue to prepare his defense, although [he] had been representing himself at times throughout

[the] matter and he had over two months to prepare his defense since the time his request to proceed pro se was granted." *Id*. And, as Leonard did, "[i]t was only when this request for a continuance was denied that [the defendant in *Richardson*] requested the appointment of counsel." *Id*.

Though Leonard attempts to distinguish his case from *Richardson*, we find his efforts unpersuasive. A defendant's "right to counsel is not something that rests in [his] pocket and something he can pull out when he desires to use it." *Id*. (internal quotations omitted). The trial court here determined that Leonard's requests for a continuance and reappointment of the public defender were simply for the purpose of delay. We see no evident, obvious, or clear error in either that determination or the court's decision to deny the last-minute requests. *See, e.g., Richardson*, 304 S.W.3d at 290; *State v. Parker*, 890 S.W.2d 312, 316-17 (Mo. App. S.D. 1994) (finding no abuse of discretion where trial court denied the "request for self-representation made on the Friday preceding the Monday the trial was to start"); *State v. Herron*, 736 S.W.2d 447, 449 (Mo. App. W.D. 1987) (holding that accompanying request for continuance was evidence of intent to delay).

Accordingly, this aspect of Point II is also denied.

### C. The trial court committed no error in failing to instruct the jury on lesser-included offenses in the absence of a request to do so.

In his final point on appeal, Leonard argues that the trial court was obligated to *sua sponte* instruct the jury on lesser-included offenses on each of the charges because the evidence supported giving them. We disagree. Regardless of whether the evidence supported the giving of the instructions, there was simply never a request for them.[7]

---

[7] Because Leonard failed to request any lesser-included offense instructions, this claim is not preserved for review and is entitled to, at most, plain error review. *State v. Williams*, 145 S.W.3d 874, 877 (Mo. App. E.D. 2004).

A trial court must instruct a jury as to lesser-included offenses when *each* of the following requirements is met:

    a. *a party timely requests the instruction*;

    b. there is a basis in the evidence for acquitting the defendant of the charged offense; and

    c. there is a basis in the evidence for convicting the defendant of the lesser included offense *for which the instruction is requested*.

*State v. Jackson*, 433 S.W.3d 390, 396 (Mo. banc 2014) (emphasis added) (footnote omitted).

"[I]nstructions on . . . lesser-included offense[s] [are] not required to be given if not requested . . . ." *State v. Ise*, 460 S.W.3d 448, 463 (Mo. App. W.D. 2015). "[A] request for the instruction is a prerequisite for imposing the requirement on a court." *Id.* (citing *State v. Derenzy*, 89 S.W.3d 472, 474 (Mo. banc 2002)). "If a defendant does not specifically request a lesser included offense instruction, the defendant may not complain about the trial court's failure to give the instruction." *State v. Fowler*, 938 S.W.2d 894, 898 (Mo. banc 1997).[8]

"Part of the rationale for this rule is that failing to request a lesser-included offense instruction is often trial strategy; the jury may convict the defendant of the lesser offense if it is submitted, but the jury may not convict the defendant of any crime if the lesser offense is not submitted." *State v. Williams*, 145 S.W.3d 874, 878 (Mo. App. E.D. 2004). "A defendant is

---

[8] Leonard argues that the Missouri Supreme Court has held that "a lesser included offense instruction may be constitutionally required even when the defendant does *not* request it." We think this argument is a stretch in light of the abundant case law to the contrary. The only authority upon which Leonard relies, a footnote in *Jackson*, merely notes that the Court had previously held, in *McNeal v. State*, 412 S.W.3d 886 (Mo. banc 2013), that a post-conviction movant was entitled to an evidentiary hearing on his claim that counsel was ineffective for failing to request a lesser-included offense instruction in order to discern whether counsel's omission was the result of inadvertence or trial strategy. *State v. Jackson*, 433 S.W.3d 390, 396 n.7 (Mo. banc 2014). Nothing in *McNeal* imposed a duty upon a trial court to instruct a jury on lesser-included offenses in the absence of a request from the defense. And, as quoted *supra*, the Court explicitly stated in *Jackson* that a prerequisite for entitlement to a lesser-included offense instruction was a timely request for one. *Jackson*, 433 S.W.3d at 396. Furthermore, because Leonard elected to proceed pro se, the constitutional implications of *McNeal*, related to the right to the effective assistance of counsel, are simply inapplicable to Leonard. *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) ("'[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."'" (quoting *U.S. v. Dougherty*, 473 F.2d 1113, 1124-26 (D.C. Cir. 1972))).

permitted to adopt a trial strategy and to attempt to persuade the jury of it." *State v. Dexter*, 954 S.W.2d 332, 344 (Mo. banc 1997). "When the failure to request a lesser-included instruction is a matter of strategy, the court should not second guess the [defense]." *Id*. "Rather, the defendant may determine whether he will give the jury an 'all or nothing' choice, or request submission of lesser-included offense instructions." *Id*. "Once having made the determination, the defendant may be held to accept the consequences of that decision." *Id*.

Here, Leonard clearly and repeatedly advised the court that his defense was one of alibi. Leonard expressed to the court that he understood both what a lesser-included offense was and that certain instructions would be given only if requested by either Leonard or the State. The court specifically advised Leonard that he had a right to submit lesser-included offense instructions. Yet, when the court held the instruction conference and pointedly asked Leonard if there were any additional instructions he wished to submit, Leonard advised the court that there were none.

It appears that Leonard's choice not to submit any lesser-included offense instructions was the result of his strategic decision to proceed with an all-or-nothing defense.[9] "Trial courts are confronted with a serious dilemma[,] and the efficient administration of criminal justice in many cases is hampered[,] if the trial judge must instruct on all lesser-included offenses, even though no request is made therefor . . . ." *State v. Olson*, 636 S.W.2d 318, 322 (Mo. banc 1982) *overruled on other grounds by Jackson*, 433 S.W.3d at 391-99. "It presents an almost impossible situation," especially in the case where "the defense was solely that [the defendant]

---

[9] We recognize that Leonard presented this claim of error in his motion for new trial, but "[i]ncluding the allegation of error in his motion for new trial does not suggest that failing to request the lesser-included offense instruction was not trial strategy"; rather, it suggests only "that a possible trial strategy was unsuccessful." *Williams*, 145 S.W.3d at 878. Additionally, Leonard had retained counsel for the purpose of filing the motion for new trial; it is entirely plausible that counsel disagreed with Leonard's chosen strategy, and for that reason raised the claim of error in the motion for new trial. But that does not negate the fact that Leonard's strategy appears to have been an all-or-nothing one.

did not do whatever was done—alibi." *Id*. Though "[o]ffering evidence of an alibi does not take away the right to have the jury instructed on lesser included offenses," *State v. Rust*, 468 S.W.2d 205, 206 (Mo. 1971), the decision *not* to offer lesser-included instructions when an alibi defense is presented is consistent with an "all-or-nothing" strategy. *Dexter*, 954 S.W.2d at 344 (citing *State v. Santillan*, 948 S.W.2d 574 (Mo. banc 1997), for the proposition that a defendant may choose to submit lesser-included instructions, even with evidence of alibi, under the recognition "that the jury could disbelieve his [alibi] theory"). Here, even assuming the evidence would have supported the giving of lesser-included offense instructions, absent any request by Leonard, if the court had done so, it would have risked interfering with Leonard's chosen defense strategy, thereby injecting error into the trial.

Accordingly, Point III is denied.

## Conclusion

The evidence was sufficient to support each of Leonard's convictions. The trial court committed no error in allowing Leonard to proceed pro se after he validly waived his right to counsel. And the trial court was not obligated to instruct the jury on lesser-included offenses in the absence of a request to do so. Leonard's convictions and sentences are affirmed.

_____
Karen King Mitchell, Judge

Cynthia L. Martin, Presiding Judge,
and Mark D. Pfeiffer, Judge, concur.

21