In the
 Missouri Court of Appeals
 Western District
 STATE OF MISSOURI, )
 )
 Respondent, ) WD83778
 )
 v. ) OPINION FILED: October 26, 2021
 )
 GARY DALE LEE, )
 )
 Appellant. )

 Appeal from the Circuit Court of Jackson County, Missouri
 The Honorable James F. Kanatzar, Judge

 Before Division Four: Cynthia L. Martin, Chief Judge, Presiding, Mark D. Pfeiffer,
 Judge and James E. Welsh, Senior Judge

 Gary Dale Lee ("Lee") appeals from a judgment convicting him of two counts of

statutory rape in the second degree. Lee challenges the sufficiency of the evidence to

support his convictions and also argues that the trial court committed legal error when it

denied his assertion of his right of self-representation. Because Lee made a timely,

unequivocal, knowing, and intelligent request to represent himself, the trial court erred by

denying Lee's request, requiring Lee's judgment of conviction and sentence to be reversed,

and this matter to be remanded for a new trial.
 Factual and Procedural Background1

 In 2016, Lee and T.G. ("Victim") began dating. Victim was born on June 10, 2000,

and turned sixteen on June 10, 2016. Lee was born on December 20, 1973. In 2016 and

2017, Lee and Victim engaged in sexual intercourse twenty or thirty times.

 In early February 2017, a woman from Victim's church arrived at Victim's residence

to give her a ride. The woman witnessed Victim and Lee engage in a passionate kiss after

which Lee told the woman to "take good care of my girl." The woman reported what she

witnessed to police.

 On October 18, 2017, Detective John Roach ("Detective Roach") interviewed Lee.

Lee admitted that he had sexual intercourse with Victim when she was sixteen, and that

Victim told him she was sixteen.

 The State charged Lee by information with two counts of statutory rape in the

second degree in violation of section 566.034.2 The information was later amended to

charge Lee as a prior and persistent offender due to his prior felony convictions for

possession of a controlled substance, statutory sodomy in the first degree, and assault in

the second degree. In the amended information, the State alleged in Count I that Lee had

sexual intercourse with Victim on or between November 1, 2016 and December 31, 2016,

and in Count II that Lee had sexual intercourse with Victim on or between January 1, 2017

and June 9, 2017.

 1
 When reviewing a conviction for sufficiency of the evidence, we view the evidence in the light most
favorable to the verdicts. State v. Glaze, 611 S.W.3d 789, 792 n.2 (Mo. App. W.D. 2020).
 2
 All statutory references are to RSMo 2016, as supplemented through the date of each crime, unless
otherwise indicated.

 2
 Lee was represented by appointed counsel at a trial conducted on May 28 and 29,

2019. That trial ended in a mistrial. Lee's trial was rescheduled to begin on January 21,

2020.

 On September 23, 2019, Lee filed a motion seeking to discharge his appointed

counsel and to represent himself at trial ("Motion").3 Lee's Motion stated:

 Comes Now, Defendant Gary D. Lee moves to proceed Pro Se, to-wit:

 (1) Defendant has a fundamental constitutional right to proceed Pro Se,
 because he is the master of his own defense. [citing Faretta v. California,
 422 U.S. 806 (1975); State v. Black, 223 S.W.3d 149 (Mo. banc 2007)]

 (2) Defendant suggest [sic] such a relationship for fear that he will be denied
 meaningful access to open courts by preventing, filing and arguing of pro se
 motions in aid of his defense, his ability to obtain evidence to present at trail
 [sic], and his ability to question witnesses in said trial that may result in the
 dismissal of charges.

 (3) Defendant sumits [sic] this motion in good faith with no intent to disrupt
 those proceedings and with respect of this courts [sic] decorum.

 (1) Grant leave to file this motion (2) grant leave to proceed Pro Se
 (3) render any further relief that may seem germane.

First Hearing on Lee's Motion

 On October 9, 2019, the trial court held a hearing on Lee's Motion. Lee indicated

that he still wished to waive his right to the assistance of counsel and to exercise his right

 3
 On September 23, 2019, Lee also filed a "Motion to Disclose" which requested "disclosure of open
records" including Independence Police Department's manual and policies concerning custodial interrogations, chain
of evidence and collection of evidence procedures "specifically pertaining to sex offenses," "interdepartmental
communication between Detectives and Prosecutors" involved in the case, and any interviews or statements made by
the Victim "that is [sic] exculpatory." The motion cited Rule 25.03, Rule 25.04, and sections 610.010 through
610.100.
 On October 3, 2019, Lee filed a "Notice of Appearance" and a motion requesting the trial court to grant
access to the law library. In the Notice of Appearance, Lee requested a hearing "so that the defendant may enter an
appearance on record, pro se," and he also requested that the court order that materials in possession of his defense
counsel be turned over to him.

 3
to represent himself. The trial court informed Lee that it needed to ask him some questions

about his request, and that depending on Lee's answers, the trial court would then rule on

his Motion. Because the trial court's inquiry of Lee is central to our resolution of this

appeal, the salient portions of the inquiry, though lengthy, are set forth below:

 [Trial court]: First of all, I must tell you that this is a terrible idea. The charges
 you are facing are serious, the ranges of punishment are significant, and for
 you to proceed without an attorney in this matter is bad judgment on your
 part. . . . Obviously, the Public Defender was appointed to represent you in
 this matter and during some point the Public Defender chose [defense
 counsel] to represent you, and it's your position now that you do not want to
 be represented by [defense counsel]; you want to represent yourself in this
 matter. Is that correct?

 [Lee]: That is correct.

Lee was then sworn in and the trial court explained to him the rights that would be

implicated by his waiver of counsel:

 [Trial court]: All right. Have you retained other counsel?

 [Lee]: No, Your Honor.

 [Trial court]: Do you intend to retain other counsel?

 [Lee]: No, Your Honor.

 [Trial court]: Do you understand you have the absolute right to represent
 yourself in this case if you wish?

 [Lee]: I do, Your Honor.

 [Trial court]: Do you also understand that you have the absolute right to have
 an attorney to assist you to represent you in this case?

 [Lee]: I do.

 [Trial court]: And in fact [], I have appointed an attorney to represent you in
 this case.

 4
[Lee]: Yes.

...

[Trial court]: And I will tell you that she's an excellent attorney, she's
appeared in front of me many times, and she is particularly adept at defending
defendants in the types of charges that you are facing. Do you understand
that?

[Lee]: Understood, Your Honor.

[Trial court]: Do you understand that if you want an attorney to represent you
in this case and you're indigent, I'm going to do that and I have done that?
Do you understand that?

[Lee]: Yes.

[Trial court]: Do you want to represent yourself in this case without the
assistance of an attorney?

[Lee]: I do.

[Trial court]: Are you absolutely sure?

[Lee]: Yes.

[Trial court]: Do you want more time to think about this decision or discuss
it with an attorney or anyone else?

[Lee]: No, sir.

[Trial court]: Is your mind made up a hundred percent that you want to
represent yourself in this case?

[Lee]: Yes, sir.

[Trial court]: All right. As I stated before, you have the absolute right to
represent yourself, but before you can do that, I need to inform you of some
things. All right?

[Lee]: Yes, sir.

 5
Lee then affirmatively acknowledged that he had been charged with two counts of statutory

rape in the second degree and that the trial court had found him to be a prior and persistent

felony offender. When asked whether he understood what that meant, Lee stated, "That

means the sentencing guidelines for the charges that I'm charged with enhance to a B and

a C instead of a C and a D." The trial court replied, "Okay, Particularly the B range of

punishment for Count I is five to fifteen years. Do you understand that?" Lee indicated

that he understood. The trial court informed Lee as to Count II:

 [Trial court]: And I believe the C felony range on Count II is under the new
 range of punishment --

 [Lee]: Yes, Your Honor.

 [Trial court]: -- which is not less than three years and not to exceed ten years.
 Do you understand that?

 [Lee]: I do, Your Honor.

 [Trial court]: All right. Understanding that, do you still want to represent
 yourself in this matter?

 [Lee]: I do.

The trial court then recited the elements for Counts I and II and Lee indicated that he

understood that the State would have to prove those elements. The trial court explained

the jury selection process:

 A number of potential jurors will be assembled in the courtroom. The State
 will ask the panel of potential jurors questions about their ability to be fair
 and impartial in this case, and you will have the opportunity to do the same.
 At the conclusion of these questions, both you and the State will be given an
 opportunity to ask the Court to strike certain potential jurors from serving on
 this case if their answers indicate that any of them are biased or cannot be
 fair and impartial. . . . And both the State and you will be given the

 6
 opportunity to choose six jurors to strike from the panel, which will result in
 [twelve] jurors and one alternate.

Lee indicated that he understood and that he did not have any questions. The trial court

continued, explaining that both Lee and the State would have the opportunity to make

opening statements, present evidence, and then make closing arguments at the end of

evidence, which Lee responded that he understood. Lee indicated that he understood that

both he and the State could make objections to questions asked during jury selection and

during the presentation of evidence, and that in order to do so, the party must state that they

have an objection, approach the bench, state the objection to the trial court, and that the

trial court would make a ruling. Again, the trial court asked if Lee had any questions and

whether he understood the process, and Lee indicated that he did not have questions, and

that he understood. The trial court continued:

 [Trial court]: [The] possible defenses that may arise in a case of this nature
 would be mistake of age, identity, and things of that nature. Do you
 understand that?

 [Lee]: Yes, sir.

 [Trial court]: Or that the crime didn't occur in Jackson County, Missouri.

 [Lee]: Yes, sir.

 [Trial court]: Or that the crime didn't occur at all.

 [Lee]: Yes, sir.

 [Trial court]: Other defenses would include anything that would raise doubt
 as to any of the elements of this crime, such as whether or not you were in
 fact in Jackson County, Missouri at the time or whether or not the offense
 that you are -- or the elements that you are accused of committing actually
 happened. Do you understand that?

 7
 [Lee]: Yes, sir.

 [Trial court]: We've already gone over the range of punishments and the
 possible penalties in this case. Do you have any questions about those?

 [Lee]: I do not, Your Honor.

Lee indicated that he understood that the case could be resolved by bench trial, jury trial,

or plea agreement. The trial court warned Lee that if convicted, the sentence would likely

be a term of imprisonment, and not probation, and Lee said he understood. Lee also

indicated that he understood that any sentencing recommendations made to the trial court

were not binding on the trial court. The trial court concluded its questioning:

 [Trial court]: You filed several pleadings in this case, so you can obviously
 read and write. Is that correct?

 [Lee]: Yes, sir.

 [Trial court]: Is your decision to represent yourself being made freely and
 voluntarily?

 [Lee]: Absolutely.

 [Trial court]: Has anyone influenced you against your will to get you to
 represent yourself in this case?

 [Lee]: No, sir.

 [Trial court]: Every time you've appeared before me, you have been polite
 and coherent. I have no reason to believe that you are not in complete control
 of your mental processes, so are you now suffering from any mental illness
 that would affect your decision to represent yourself in this case?

 [Lee]: No, sir.

 [Trial court]: Again, you have the right to represent yourself in this matter.
 However, I must advise you that it's usually a mistake to proceed without a
 lawyer, especially when you're facing the type of charges that you're facing.
 For example, you may not be aware of where certain objections need to be

 8
made or be familiar with specific rules of evidence that may affect the
outcome of the case. You will not be able to claim inadequacy of
representation after the trial. Do you understand that?

[Lee]: I do, Your Honor.

[Trial court]: Is it still your wish to waive your right to counsel and represent
yourself in this matter?

[Lee]: It is.

The trial court then addressed Lee's defense counsel and the State:

[Trial court]: All right, [defense counsel]. Anything you want to say?

[Defense counsel]: No, Your Honor.

[Trial court]: [Prosecutor], what's your position on the defendant's motion? I
see the State never filed a response.

[The State]: Judge, I was made aware of it, but I don't believe [the other
prosecutor] was aware of it. She's been out of town. It's the State's position
that we know the defendant has the right to proceed pro se. We would
object insofar as the defendant being allowed to cross-examine the victim
and other witnesses that were also considered victims of this particular
defendant. I think that based on the circumstances, having him stand before
them and be allowed to cross-examine them in person would be incredibly
intimidating and hurtful and traumatic.

[Trial court]: Do you have any case law that supports your position that
those concerns override his constitutional right to represent himself?

[The State]: Judge, I don't as of right now. I can do some research and get to
you some information on that.

[Defense counsel]: I'm pretty sure there is no case law. He has an absolute
right to represent himself as long as he passes the questions that you asked
him.

[The State]: We request that some kind of standby counsel or surrogate be
used so that whatever questions he wants to ask can be asked, that it's not just
him in person directly standing in front of the victim.

 9
 [Trial court]: I tell you what: I'm going to take this under advisement. I'll give
 you five days to file a written response to his motion.

(Emphasis added.)

 On October 16, 2019, the State filed a response to Lee's Motion, wherein it indicated

that it did "not object to [Lee's] exercise of his right to proceed pro se and represent

himself." (Emphasis added.) The State's motion did reflect a continuing concern "about

the child victim in this case being directly cross-examined at trial by [Lee]." The motion

stated, "Counsel for the State could find no caselaw on point to prohibit defendant from

exercising his right to confrontation. Counsel for [the] State is requesting that there be

safeguards and/or an admonishment be made so that the child victim is not subjected to

further emotional or psychological trauma."

 On November 8, 2019, Lee filed a "Motion for Hearing to Show Cause" wherein he

requested a hearing "so that [his defense counsel] may show cause for failure to respond to

this Honorable Court's order and for a respect [sic] request for this Honorable Court to rule

on the previous motions that the defendant filed."4 The motion also indicated that Lee still

wished to waive his right to counsel and represent himself.

Second Hearing on Lee's Motion

 On December 4, 2019, the trial court held a second hearing on Lee's Motion. The

trial court again probed Lee regarding his waiver of his right to counsel, except that this

time, the trial court quizzed Lee, asking detailed open-ended questions. In response to

 4
 On November 8, 2019, Lee also filed a "Motion for Funds for Depositions and Trial Transcripts from First
Trial on Behalf of Defendant."

 10
questioning, Lee correctly stated that he was facing two charges of second-degree statutory

rape, and he stated the accurate charged time periods for the offenses. Lee stated that the

elements of statutory rape in the second-degree consisted of "a person over the age of

[twenty-one] [having] some type of sexual contact or sexual intercourse with a person

under the age of [seventeen]." When asked about the range of punishment for his offenses,

he responded, "[W]ith the sentencing enhancement, on the first charge I'm facing a

sentencing enhancement to a B felony, which carries a range of punishment from five years

to [fifteen] years, and in the second one, I am facing a range of punishment from four years

to ten years with the sentence enhancement from the D to a C."

 The trial court asked Lee about lesser-included offenses:

 [Trial court]: Do you understand what the concept is of a lesser-included
 offense?

 [Lee]: I believe I do, Your Honor.

 [Trial court]: What do you think that is?

 [Lee]: A lesser-included offense is a charge that the jury or Your Honor could
 find that I could be guilty of even though it is not a charge that I'm charged
 with.

 [Trial court]: What are the types of lesser-included offenses that could be
 submitted in this case?

 [Lee]: It could range anywhere from sexual misconduct to any number of
 felonies ranging from B's all the way down to an E, Your Honor.

 [Trial court]: Do you know the specific charges, though?

 [Lee]: I mean from second-degree sexual misconduct to third-degree sexual
 misconduct, which I believe is a D felony. There's just . . . too many to recite
 or to know off the top of my head.

 11
 [Trial court]: Can you tell me what the legal basis is for . . . the appropriate
 submission of a lesser-included offense?

 [Lee] That I can't, Your Honor.

The trial court also asked Lee about the effect of its finding that Lee was a prior and

persistent felony offender, and Lee replied, "It allows the prosecution to bring in my prior

offense to the jury." The trial court responded, "anything else?" and Lee stated, "In a

nutshell, that's essentially it. If I remember the ruling that you made correctly, it was the

fact that they could bring in the fact that I was [] a prior offender, and had done jail time or

done prison time for it." Lee indicated that his case could be resolved by plea agreement,

by trial, or by "a dismissal due to evidence."

 When asked about the process of a jury trial, Lee stated, "I would imagine we would

start with the motions that I filed. I would collect all the evidence I could collect and try to

put on . . . an intelligent defense and we would pick a jury. The State would [] present their

case and then I would present my case and Your Honor would give it to the jury and we

would see what would happen from there." The trial court then asked Lee if he could

explain the process for making objections at trial, and Lee indicated that he could not.

Next, the trial court inquired into Lee's knowledge concerning the admission of propensity

evidence, and its limitations:

 [Trial court]: Can you tell me what the current law is on propensity evidence
 in the state of Missouri and how it might affect your case?

 ....

 [Lee]: Under I believe it's Section 18(a) of the United States Constitution, if
 a person with a sex offense has been prior convicted of a sex offense, then it
 is allowed to be used in trial against him or her.

 12
 [Trial court]: Are you aware of any limitations as it pertains to the
 admissibility of propensity evidence?

 [Lee]: Any limitations? No, I'm not, Your Honor.

 The trial court then asked Lee "what the legal basis is for a juror to be qualified to

serve on a criminal jury" and Lee indicated that a juror could not be a convicted felon, they

must be a citizen of the United States, and he stated that the "jury is generally picked out

of the county that the defendant is being tried in." The trial court asked, "Are there any

limitations that you're aware of as to what kind of questions can be asked [of potential

jurors during jury selection] or what kind of questions may be objectionable?" Lee stated

that he was not aware of any limitations. He was unable to explain the legal basis for a

motion to strike a juror for cause and he did not know the number of peremptory strikes

allowed in a criminal case.

 When asked what a Brady violation was, Lee replied, "A Brady violation is any

material that is exculpatory that the prosecution doesn't turn over to . . . the defendant in .

. . a motion for discovery." The trial court asked Lee what he would be allowed to discuss

during an opening statement, and if there were any limitations on what could be presented

during closing arguments and Lee responded that the parties could only "discuss things that

were discoverable," meaning "things that [he] obtained from the prosecution in discovery

or things that the prosecution obtained from [him]," and he stated they were "not allowed

to do the rape shield law, not allowed to use anything about the alleged victim's prior

promiscuity or anything of such nature." The trial court asked Lee if he could state the

 13
limitations of questioning during cross-examination and direct examination of witnesses

and Lee stated, "Again[,] it has to stay within the scope of discovery."

 The trial court then denied Lee's Motion, noting as follows:

 All right. Based upon the defendant's responses to my questions, I am not
 satisfied that his decision to represent himself is being made knowingly or
 intelligently, which is required by the applicable case law. So[,] I am going
 to deny your request to represent yourself in this case.

 Lee's jury trial began on January 21, 2020. At the beginning of the trial, Lee

renewed his request to exercise his right to represent himself, which was denied.

 The crux of Lee's defense at trial was that he did not know that Victim was sixteen

when they engaged in sexual intercourse. Lee did not testify, but presented testimony from

his daughter, sister, and niece who all stated that Victim told them she was eighteen-years-

old.

 The jury found Lee guilty on both counts of statutory rape in the second degree.

The trial court sentenced Lee to eight years imprisonment on each count, to run

concurrently. Lee filed a motion for judgment of acquittal or, alternatively, for a new trial,

wherein he argued, inter alia, that the trial court erred in denying his Motion.

 Lee appeals.

 Analysis

 14
 Lee raises three points on appeal. In Points One and Two, 5 Lee asserts that there

was insufficient evidence to sustain his convictions for statutory rape in the second degree,

in that the State was required to prove that Victim was less than seventeen years of age,

but "the evidence in the case established [Victim] was seventeen years old during the

charge period if her life began at conception as required by section 1.205." Lee's third

point on appeal contends that the trial court committed legal error when it denied him the

right to represent himself. We begin by addressing Lee's third point on appeal.

Point Three--Lee's Assertion of his Right of Self-representation

 The Sixth Amendment to the United States Constitution guarantees a criminal

defendant the right to counsel. State v. Black, 223 S.W.3d 149, 153 (Mo. banc 2007). "In

Faretta v. California, the United States Supreme Court recognized that the federal Sixth

Amendment right to counsel 'implicitly embodies a correlative right to dispense with a

lawyer's help.'"6 Id. (quoting Faretta v. California, 422 U.S. 806, 814 (1975) (citing U.S.

Const. amend. VI). "The language and spirit of the Sixth Amendment contemplate that

counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a

willing defendant—not an organ of the State interposed between an unwilling defendant

and his right to defend himself personally." Id. (quoting Faretta, 422 U.S. at 820). "To

thrust counsel upon the accused, against his considered wish, thus violates the logic of the

 5
 Points One and Two challenge the sufficiency of the evidence to sustain Lee's convictions for Counts I and
II, respectively. We address these points collectively.
 6
 The Missouri Constitution has also recognized the right to self-representation. Black, 223 S.W.3d at 153,
n.2 (citing Mo. Const. art. 1, sec. 18(a) (providing that "in criminal prosecutions the accused shall have the right to
appear and defend, in person and by counsel"); State v. Warren, 321 S.W.2d 705, 710 (Mo. 1959)). Further, "[t]he
protections provided by Section 18(a) of the Missouri Constitution are coextensive with those of the Sixth
Amendment." State v. Campbell, 600 S.W.3d 780, 787 n.3 (Mo. App. W.D. 2020) (citing State v. Hester, 801
S.W.2d 695, 697 (Mo. banc 1991)).

 15
Amendment." Id. (quoting Faretta, 422 U.S. at 820). "The right of self-representation so

implied into the Sixth Amendment is applicable to the states by way of the Due Process

Clause of the Fourteenth Amendment, and prevents a state from forcing upon a defendant

unwanted counsel." Id. (citing Faretta, 422 U.S. at 836).

 "Denial of a defendant's right of self-representation is structural error, and

accordingly is not subject to harmless error analysis." State v. McMillon, 436 S.W.3d 663,

667 (Mo. App. E.D. 2014) (citing Black, 223 S.W.3d at 153). "There is no discretion for

a trial court to force an attorney upon a competent defendant who makes a (1) timely, (2)

unequivocal, (3) knowing, and (4) intelligent waiver of the right to counsel." State v.

Johnson, 328 S.W.3d 385, 394 (Mo. App. E.D. 2010) (citing Black, 223 S.W.3d at 153).

"To the extent appellate review involves a determination of whether these factors were met

to constitute a valid waiver, it is de novo." Id. (citing United States v. Kind, 194 F.3d 900,

903-04 (8th Cir. 1999)).

 The State concedes, and we agree, that there is no question that Lee made a timely

and unequivocal assertion of his right to self-representation. Lee filed his Motion on

September 23, 2019, four months before his trial began. See State v. Murray, 469 S.W.3d

921, 926 (Mo. App. E.D. 2015). His request to proceed pro se was unequivocal. In his

motion, Lee relied on Faretta v. California and State v. Black to assert that he "ha[d] a

fundamental constitutional right to proceed Pro Se" and he requested that the trial court

"grant leave to [allow him] to proceed Pro Se." 422 U.S. 806; 223 S.W.3d 149. Lee

continued to assert his right to self-representation at two hearings concerning the Motion

 16
on October 9, 2019 and December 4, 2019, in his pro se filings before trial, on the first

morning of trial, and in his motion for new trial.

 The issue that remains, then, is whether Lee's request to waive his right to counsel

and to exercise his right of self-representation was made knowingly and intelligently.

A knowing and intelligent waiver of the right to be represented by counsel does not
require technical knowledge or mastery of trial process or legal principles

 The United States Supreme Court recognized the constitutional right to self-

represent, and described the standard for determining whether a criminal defendant has

knowingly and intelligently waived the right to be represented by counsel in Faretta, 422

U.S. 806. In Faretta, a defendant timely requested to represent himself at trial. 422 U.S.

at 808-09. At a hearing concerning the defendant's request, "[q]uestioning by the judge

revealed that Faretta had once represented himself in a criminal prosecution, that he had a

high school education, and that he did not want to be represented by the public defender

because he believed that that office was 'very loaded down with . . . a heavy case load.'"

Id. at 807. The trial court informed the defendant that it believed he "was 'making a

mistake' and emphasized that in further proceedings Faretta would receive no special

favors." Id. at 808. The trial court, "in a 'preliminary ruling,' accepted Faretta's waiver of

the assistance of counsel." Id. Several weeks later, however, the trial court sua sponte held

a second hearing "to inquire into Faretta's ability to conduct his own defense, and

questioned him specifically about both the hearsay rule and the state law governing the

 17
challenge of potential jurors."7 Id. The trial court then ruled that Faretta "had not made an

intelligent and knowing waiver of his right to the assistance of counsel . . . ." Id. at 809-

10.

 The United States Supreme Court held that the defendant's waiver of assistance of

counsel was timely, unequivocal, knowing, and intelligent; therefore, when the trial court

forced the defendant to accept an attorney, the defendant was deprived of his constitutional

right to conduct his own defense. Id. at 835-36. The Supreme Court reasoned:

 [W]eeks before trial, Faretta clearly and unequivocally declared to the trial
 judge that he wanted to represent himself and did not want counsel. The
 record affirmatively shows that Faretta was literate, competent, and
 understanding, and that he was voluntarily exercising his informed free will.
 The trial judge had warned Faretta that he thought it was a mistake not to
 accept the assistance of counsel, and that Faretta would be required to follow
 all the 'ground rules' of trial procedure.

Id. In reference to the trial court's second hearing inquiring into the defendant's waiver of

counsel, the Supreme Court ruled that the defendant's "technical legal knowledge . . . was

not relevant to an assessment of his knowing exercise of the right to defend himself[,]"

and that the trial court did not need to assess "how well or poorly Faretta had mastered the

intricacies of the hearsay rule and the California code provisions that govern challenges of

potential jurors on voir dire." Id. at 836 (emphasis added).

 Faretta thus articulated the controlling parameters for determining whether a

defendant's waiver of the right to counsel is knowing and intelligent. Though a defendant

 7
 In a footnote, the Supreme Court detailed the colloquy between the trial court and the defendant, which
revealed that the defendant had filed multiple pro se motions, one of which he thought might dispose of the case.
Faretta 422 U.S. at 808, n.3. The trial court quizzed the defendant on his research which revealed that the defendant
was unfamiliar with exceptions to the hearsay rule and he was unable to state the grounds for challenging a juror for
cause. Id.

 18
is entitled to represent himself at trial, the defendant "must 'knowingly and intelligently'

forgo [the] relinquished benefits" which are traditionally associated with the right to

counsel. Id. at 835 (citations omitted). This does not mean that a defendant must "have

the skill and experience of a lawyer in order competently and intelligently to choose self-

representation[.]" Id. (citation omitted). Rather, at a Faretta hearing prior to the trial court's

ruling on defendant's waiver, the defendant "should be made aware of the dangers and

disadvantages of self-representation, so that the record will establish that 'he knows what

he is doing and his choice is made with eyes open.'" Id. (citation omitted). However, a

defendant's "technical legal knowledge" is irrelevant to whether the waiver of the right to

counsel is knowing and intelligent. Id. at 836.

 Subsequent to Faretta, these parameters have been consistently applied to

differentiate between inquiry that is relevant to determining whether waiver of the right to

counsel is knowing and intelligent, and inquiry of a defendant that improperly crosses into

an assessment of a defendant's technical legal knowledge. For example, in Jones v.

Norman, 633 F.3d 661, 663 (8th Cir. 2011), the State of Missouri appealed a federal district

court's grant of a writ of habeas corpus after finding that "the Missouri court that presided

over Jones' trial violated clearly established Supreme Court law by denying Jones' request

to represent himself." Upon a review of the trial court's Faretta hearing, the Eighth Circuit

held that the trial court committed constitutional error "by relying on factors related to

Jones' ability to represent himself, rather than limiting its analysis to whether Jones had

knowingly and voluntarily waived his right to counsel." Id. at 666. The record from the

Faretta hearing revealed the following:

 19
 . . . Jones stated that he understood the potential consequences of representing
 himself and that his request to do so was totally voluntary. The trial court
 then asked Jones questions about his knowledge of the upcoming
 proceedings. Jones said that he understood the charges against him and he
 was able to identify all three counts he faced. The court asked whether Jones
 knew the possible penalties associated with those charges. Jones correctly
 stated the penalty range for count one, but misstated the minimum penalty
 for count two, and admitted he did not know the penalty range for count three.
 The court then asked Jones to identify the consequences of his being
 charged as a prior and persistent offender. He was able to identify only
 one specific consequence. When asked about additional consequences,
 Jones responded that he was generally aware that the designation had other
 negative consequences but that he did not know the details. The trial court
 also asked Jones about his familiarity with the Missouri Rules of Criminal
 Procedure. Jones stated he was aware the rules existed and that he would
 have to comply with the rules, but that he was not currently familiar with
 their substance.

Id. at 664 (emphasis added).

 The Eighth Circuit found that the trial court relied on improper grounds in denying

Jones' request to represent himself.8 First, the trial court committed constitutional error

when it relied on the fact that Jones was unfamiliar with the Missouri Rules of Criminal

Procedure because this amounted to "technical legal knowledge." Id. at 667-68 (citing

Faretta, 422 U.S. at 835-36). The court explained:

 A court may—and in fact usually must—make a defendant aware of the
 expectations he will be held to if he represents himself. The court may not,
 however, independently consider whether the court believes the defendant
 will be successful in the face of those expectations when the court is
 determining whether the defendant's waiver is knowing and voluntary.
 Jones stated that he understood that the Missouri Rules of Criminal
 Procedure would govern his trial and that he would be expected to comply
 with them just as any formally trained lawyer would be. Although Jones

 8
 The Eighth Circuit noted three improper grounds. The first two are relevant for our analysis. The third
improper ground was "the trial court's reliance on Jones' reduced ability to take trial notes [due to an arm injury.]"
633 F.3d at 668. "Whether a defendant can take notes as fast as a lawyer might effect [sic] his ability to represent
himself effectively, but it does not have any bearing on his ability to understand the consequences of waiving his
right to counsel." Id.

 20
 conceded he had not yet learned the rules of procedure, his request to
 represent himself was made well before his trial was to begin and he had
 considerable time to familiarize himself with the rules if his request was
 granted. Requiring knowledge of the substance of the rules, rather than
 merely requiring understanding of their existence and importance, shifts
 the focus away from whether a defendant's waiver is informed toward
 whether the defendant is actually prepared to ably represent himself. This
 violates the defendant's Sixth Amendment right to represent himself if he
 knowingly and voluntarily chooses to do so, regardless of whether doing so
 is to his detriment.

Id. (emphasis added) (citations omitted). Second, the trial court's reliance on "Jones'

inability to state the exact range of penalties he faced on each count as a ground for finding

his request was not knowing and voluntary" was unconstitutional because there was "no

indication in the record that Jones did not understand or was not capable of understanding

the seriousness of the penalties that he faced," but he merely "could not recall all of the

specifics of the statutory penalty ranges." Id. at 668. The court explained that while "[a]

defendant is required to understand the penalties he faces before he can waive his right to

counsel . . . memorizing and understanding are not the same thing. This requirement puts

a duty on the trial court to inform and to probe defendant's understanding, it does not allow

the court to quiz a defendant and find his waiver involuntary or unknowing if he does not

get it right on the first try." Id. (citation omitted).

 In holding that the defendant was impermissibly denied his right of self-

representation, the Eighth Circuit emphasized:

 The amount of information a court needs to provide to a defendant and the
 amount of inquiry the court is required to make to test the defendant's
 understanding depends on the background, experiences, and conduct of the
 accused. However, the relevant test is whether—given these factors—he
 had enough information to represent himself; a court is not permitted to
 consider whether—given these factors—a defendant could have ably

 21
 defended himself. Faretta itself makes clear the view that self-representation
 in most cases will have negative consequences. But despite the potential ill-
 consequences of self-representation, we permit it because of our society's
 respect for individual dignity, once the individual has been fairly advised of
 consequences and has made a knowing and intelligent decision.

Id. at 667 (emphasis added) (citations omitted).

 In State v. Black, the Missouri Supreme Court addressed Faretta and the "areas of

inquiry that should be explored on the record to ensure that a defendant's waiver is knowing

and intelligent." 223 S.W.3d at 155-156. In Black, the defendant's request to waive his

right to counsel and exercise his right of self-representation was denied because the trial

court concluded the defendant was "less qualified" than his "capable and experienced

counsel" who was "available at no expense" to the defendant. Id. at 155. Our Supreme

Court reversed, and held:

 The record failed to establish that Black's waiver was not intelligent and
 knowing. It is well established that a defendant's "technical legal knowledge,
 as such, [is] not relevant to an assessment of his knowing exercise of the right
 to defend himself." . . . It was error for the trial court to refuse to honor
 Black's requests to represent himself simply because it felt that his attorneys
 could do better.

Id. (quoting Faretta, 422 U.S. at 836).

 In an effort to provide guidance to trial courts, the Supreme Court laid out "certain

areas of inquiry that should be explored on the record to ensure that a defendant's waiver

is knowing and intelligent."9 Id. at 155-56. "A thorough evidentiary hearing must support

9
 Black noted:

 The decision whether to allow a criminal defendant to waive the right to counsel and exercise the
 right of self-representation is one of the most sensitive rulings required of a trial court. It is likely
 that a defendant convicted of a serious crime will appeal either decision of the court.

 22
the trial court's ruling upon a defendant's timely and unequivocal request to proceed pro se.

It is not possible to come up with a rigid procedure or 'script.'" Id. at 155. At a minimum,

"a defendant's waiver is not knowing and intelligent unless the court timely informs him as

to the nature of the charges against him, potential sentences if convicted of the offenses,

potential defenses he can offer, the nature of the trial proceedings, [and] the fact that, if the

defendant refuses counsel, he will be required to proceed pro se and the dangers of

proceeding pro se." Id. at 154 (quoting City of St. Peters v. Hodak, 125 S.W.3d 892, 894

(Mo. App. E.D. 2004)). In a Faretta hearing, trial court should: (1) "inquire into the

defendant's capacity to make an intelligent decision and his knowledge of his own

situation" which "does not mean that the defendant must be as legally competent as an

attorney;" however, "the court should ensure that the defendant is not acting under duress,

does not suffer from a mental incapacity, is literate and is minimally familiar with the trial

process, including possible defenses to the crime charged, the different phases of trial,

objection procedure and the elements of the crime charged;" (2) "make certain that the

defendant understands the possible penalties if convicted"; and (3) "be sure that the

defendant understands exactly what rights and privileges he is waiving, as well the dangers

associated with waiving constitutional rights." Id. at 156. (emphasis added) (citations

omitted).

 Though Black did not elaborate on the meaning of "minimally familiar with the trial

process," it is plain from other holdings in the opinion that the phrase does not include

223 S.W.3d at 155. Other Missouri courts have recognized that "[t]he right to counsel and the right to self-
representation are in obvious tension." State v. Kunonga, 490 S.W.3d 746, 763 (Mo. App. W.D. 2016).

 23
"technical legal knowledge," or a demonstrated proficiency that would rival that of a

licensed attorney. Id. at 155. Moreover, it is unassailable that the phrase "minimally

familiar with the trial process" cannot be interpreted in a manner that would restrict the

right to self-represent more narrowly than that permitted by the United States Constitution.

"The protections provided by Section 18(a) of the Missouri Constitution are coextensive

with those of the Sixth Amendment." State v. Campbell, 600 S.W.3d 780, 787 n.3 (Mo.

App. W.D. 2020) (citing State v. Hester, 801 S.W.2d 695, 697 (Mo. banc 1991)).

 Following Black, other Missouri cases have analyzed whether a defendant's waiver

of the assistance of counsel was knowing and intelligent because the defendant

demonstrated that he was "minimally familiar with the trial process." In State v. Murray,

469 S.W.3d at 927-28, the Eastern District analyzed whether the defendant was "minimally

familiar with the trial process," including possible defenses, phases of trial, objections, and

elements of the crimes charged. The court explained, "This is a low bar because we are

not concerned with [the defendant's] technical knowledge of the law." Id. (citing Faretta,

422 U.S. at 836) (emphasis added). The Eastern District determined that the defendant

"was at least 'minimally familiar' with potential defenses" because when asked about

potential defenses he responded, "Any defenses? I got—I got a lot of defense, for real. Lot

of defense. I got my paperwork ready" and "[e]lsewhere in the record, Murray mentioned

his plans to show the jury surveillance video of the incident [apparently because he]

believed the video would prove he was misidentified." Id. "Further, Murray believed he

would 'be able to catch everybody lying when we go to trial.'" Id. The court determined

that Murray was "at least 'minimally familiar' with the different phases of trial" and the

 24
elements of the crimes charged. "Murray knew that a jury had to be selected." Id. at 928.

When asked about the elements of his case, Murray replied that the State would have to

prove "[b]eyond a reasonable doubt that [he was] guilty of [the] crime," but he was unable

to specifically state the elements and he "was unclear as to the difference between first-

and second-degree robbery and the difference between general- and specific-intent

crimes." Id. The court concluded that the defendant was at least minimally familiar with

objections from his statement that:

 I won't use objections the wrong way, because there are certain things . . .
 people will say, they really don't make sense. I'll let—certain things I will let
 just pass me by anyway, because some things, if I don't understand, the jury
 don't understand them. If they're using big words, big old fancy words, God
 can't understand. Believe me, most likely he don't understand either.

Id. The Eastern District concluded that "[t]he record reflects that Murray had minimal

familiarity with the trial process and a strategy for making (or not making) objections." Id.

 In State v. Leonard, 490 S.W.3d 730, 740 (Mo. App. W.D. 2016), a defendant

challenged the knowing and intelligent nature of his waiver of the right to counsel. The

trial court in Leonard conducted a thorough Faretta hearing, which "covered each of the

topics identified in [section] 600.051.1,"10 and which the defendant acknowledged;

however, the defendant claimed that "there was a clear deficiency in this Faretta hearing

involving [his] understanding of the elements of the charges, defenses, and lesser included

 10
 "Under [section] 600.051.1, before a court may accept a waiver of counsel from a criminal defendant, the
court must advise the defendant of the following: (1) the nature of the charges; (2) the defendant's right to a trial on
the charges and the right to a trial by jury; (3) the range of punishment for each charge; (4) that any
recommendations by the prosecutor are not binding on the judge and may be rejected; (5) that, if the defendant is
found guilty, the judge is most likely to impose a sentence of confinement; and (6) that, if indigent, the defendant
has a right to request the judge to appoint counsel to assist the defendant." Leonard, 490 S.W.3d at 740.

 25
offenses." Id. A review of the record indicated that the defendant was questioned

thoroughly on his understanding of the topics he complained of. Id. at 741. When asked

about the elements of the crimes he was charged with, the defendant responded that he did

not know all of the elements and that he was still researching them. Id. The defendant

indicated that if he was granted a continuance, he "would be able to come to some

understanding" of the elements, and after the Faretta hearing, he was granted a

continuance. Id. "[The defendant] had already indicated to the court that he intended to

present an alibi defense. Nevertheless, the trial court inquired as to whether Leonard was

prepared to put on that defense, and he indicated that he was." Id. The trial court asked

about the defendant's knowledge of lesser-included offenses, and the defendant "explained

that it was essentially a lesser charge [and he] also indicated his understanding that 'there

are certain instructions that are only properly given if they are requested either by

[defendant] or by the State.'" Id. After concluding that the defendant's Faretta hearing

was not deficient, our court reiterated:

 A defendant's "technical legal knowledge, as such, [i]s not relevant to an
 assessment of his knowing exercise of the right to defend himself." Faretta,
 422 U.S. at 836; see also Godinez v. Moran, 509 U.S. 389, 399 (1993)
 ("[T]he competence that is required of a defendant seeking to waive his right
 to counsel is the competence to waive the right, not the competence to
 represent himself."). "[T]he right to waive counsel is the right knowingly to
 proceed in ignorance . . . into the labyrinth of the law without the assistance
 of a trained guide." State v. Shafer, 969 S.W.2d 719, 728–29 (Mo. banc
 1998).

Id.

The Record Fails to Establish that Lee's Waiver of the Right to Counsel was not Knowing
and Intelligent

 26
 With the standard for determining whether a defendant's waiver of the right to

counsel is knowing and intelligent firmly established, we turn to the trial court's

determination of the knowing and intelligent nature of Lee's request. As was the case in

Faretta, the trial court conducted two separate hearings in response to Lee's Motion. 422

U.S. at 808. During the first hearing, the trial court plainly complied with Black's directive

to ensure that Lee understood "the nature of the charges against him, potential sentences if

convicted of the offenses, potential defenses he can offer, the nature of the trial

proceedings, [and] the fact that, if the defendant refuses counsel, he will be required to

proceed pro se and the dangers of proceeding pro se." Black, 223 S.W.3d at 154 (quoting

Hodak, 125 S.W.3d at 894). During the first hearing, the trial court acknowledged that Lee

was "obviously" literate, and went further to state, "every time you've appeared before me,

you have been polite and coherent. I have no reason to believe that you are not in complete

control of your mental processes."

 During the second hearing on Lee's Motion, the trial court's inquiry of Lee became

highly specific and technical in nature. Yet, despite the arguably improper inquiry into

Lee's technical legal knowledge, the record establishes that Lee demonstrated far more than

a "minimal[] familiar[ity] with the trial process, including possible defenses to the crime

charged, the different phases of trial, objection procedure and the elements of the crime

charged." Black, 223 S.W.3d at 156. Lee affirmatively stated that he understood the

charges and the elements of those charges during his first hearing, and reiterated that

knowledge and understanding during his second hearing. Lee correctly stated that he faced

two charges of second-degree statutory rape and knew the accurate charged time periods

 27
for the offenses. Lee indicated that the elements of statutory rape in the second-degree

consisted of "a person over the age of [twenty-one] [having] some type of sexual contact

or sexual intercourse with a person under the age of [seventeen]." That Lee inserted "some

type of sexual contact" as an element to second-degree statutory rape is immaterial -- his

statement demonstrated that he was at least "minimally familiar" with the elements of his

charged offense. See Murray, 469 S.W.3d at 928 (defendant's waiver was knowing and

intelligent even where the defendant only recited the State's burden of proof, but did not

state the elements that the State was required to prove; further, he was "unclear as to the

difference between first- and second-degree robbery and the difference between general-

and specific-intent crimes," although he was charged with first-degree robbery); Leonard,

490 S.W.3d at 741 (defendant's Faretta hearing was sufficient even where the defendant

could not state the elements to any of his four charges but he indicated that if given more

time, he "would be able to come to some understanding" of the elements).

 Moreover, the trial court advised Lee of the possible defenses that could arise in a

case of this nature, and Lee indicated that he understood. The record indicates that Lee

understood the possible penalties if convicted. Black, 223 S.W.3d at 156. At the first

hearing, the trial court advised Lee that his range of punishment on Count I was five to

fifteen years and his range of punishment on Count II was not less than three years and not

to exceed ten years. Lee indicated that he understood and that he still wished to represent

himself. During his second hearing, when asked about the range of punishment he faced,

Lee stated that "with the sentencing enhancement, on the first charge I'm facing a

sentencing enhancement to a B felony, which carries a range of punishment from five years

 28
to [fifteen] years; and in the second one, I am facing a range of punishment from four years

to ten years with the sentence enhancement from the D to a C." This statement was not

entirely correct in that Lee stated that the minimum punishment for Count II was four,

rather than three years; however, his answer actually overestimated his range of

punishment. Lee's answer nonetheless demonstrated that he possessed a minimal

familiarity with the possible penalties if convicted. See Jones, 633 F.3d at 668.

 In addition, during the first hearing, Lee indicated that he understood the various

phases of trial. The trial court explained the process for jury selection, opening statements,

presentation of evidence, and closing arguments. Lee told the trial court that he understood

the processes and that he did not have any questions. During the second hearing, Lee's

answers demonstrated that he was beyond "minimally familiar" with the phases of trial, in

that he explained, "we would start with the motions that I filed. I would collect all the

evidence I could collect and try to put on . . . an intelligent defense and we would pick a

jury. The State would [] present their case and then I would present my case and Your

Honor would give it to the jury and we would see what would happen from there."

 The record reflects that Lee understood "exactly what rights and privileges he [was]

waiving, as well the dangers associated with waiving constitutional rights." Black, 223

S.W.3d at 156. Lee affirmatively answered that he understood that he had the right to have

an attorney, even if indigent. Lee indicated that he understood all of the topics itemized in

section 600.051.1.11 And, the trial court twice advised Lee that he was making a mistake:

 11
 The record does not indicate whether Lee signed a written waiver of the right to assistance of counsel, as
required by section 600.051.1, likely because his request to self-represent was not granted. The trial court is
reminded to ensure compliance with the written waiver requirement on remand. See Kunonga, 490 S.W.3d at 764

 29
 I must tell you that this is a terrible idea. The charges you are facing are
 serious, the ranges of punishment are significant, and for you to proceed
 without an attorney in this matter is bad judgment on your part.

 ....

 It's usually a mistake to proceed without a lawyer, especially when you're
 facing the type of charges that you're facing. For example, you may not be
 aware of where certain objections need to be made or be familiar with
 specific rules of evidence that may affect the outcome of the case. You will
 not be able to claim inadequacy of representation after the trial. Do you
 understand that?

Lee indicated that he understood and that he still wished to waive his right to counsel and

exercise his right of self-representation.

 The record does not support the trial court's conclusion that Lee's waiver was

unknowing and unintelligent. Rather, it reflects that Lee was competent, literate, and at

least minimally familiar with the trial process; and that he understood the possible penalties

if convicted, what rights and privileges he was waiving, and the dangers associated with

waiving those rights. Black, 223 S.W.3d at 156. In other words, the record establishes that

Lee "[knew] what he [was] doing and his choice [was] made with eyes open." Faretta,

422 U.S. at 835 (citation omitted).

 It is noteworthy that the State did not oppose Lee's Motion before the trial court,

and conceded at the conclusion of the first Faretta hearing that Lee had established that he

was entitled to exercise his right to self-represent. On appeal, however, the State now

(the "two requirements which must be satisfied in Missouri before a trial court can conclude that a defendant has
effectively waived the right to counsel" are: (1) "a 'thorough [Faretta] evidentiary hearing' that establishes that 'the
defendant understands exactly what rights and privileges he is waiving, as well as the dangers associated with
waiving constitutional rights'" and (2) "the defendant must be afforded the opportunity to sign 'the written form as
mandated' by the General Assembly." (citations omitted)).

 30
contends that the trial court correctly concluded after the second hearing that Lee's waiver

was not knowing and intelligent because the "record contains sufficient evidence that [Lee]

did not possess a minimal understanding of the trial process." Specifically, the State asserts

that Lee did not possess a minimal understanding of the trial process because he did not

know: (1) the legal basis for submission of a lesser-included offense; (2) all of the effects

of the trial court's prior and persistent offender finding; and (3) limits of the admission of

propensity evidence.

 The State offers no support for its assertion that these specific areas of knowledge

fall within the constitutionally permissible meaning of "minimally familiar with the trial

process." Instead, we find that the examples identified by the State constitute examples of

"technical legal knowledge" that is irrelevant to determining whether Lee's waiver was

knowing and intelligent. See Jones, 633 F.3d at 667-78 (trial court erred in relying on

defendant's lack of technical legal knowledge, including the fact that he had not learned

the substance of the Missouri Rules of Criminal Procedure and that he could only identify

one specific consequence of his prior and persistent offender finding, as bases to deny

defendant's request to represent himself). Moreover, even if the examples identified by the

State involve topics that were generally relevant to Lee's knowing and intelligent waiver

of counsel, Lee established he was minimally familiar with the topics. Lee knew that he

could be convicted of a lesser-included offense and he described the nature of propensity

evidence. He was also aware of the most significant effect of the trial court's prior and

persistent offender finding, which is that it lengthened his potential ranges of punishment.

 31
 The State also argues that Lee was not minimally familiar with the trial process

because he could not recite all of the legal qualifications of jurors, and that he "did not

know the legal basis for a motion to strike a potential juror for cause[, he] did not know

how many peremptory strikes are allowed in a criminal trial [and he] was unaware of any

limitations on the questions that could be asked in voir dire." The State's argument ignores

the clear directive of Faretta that "technical legal knowledge" is "not relevant to an

assessment of [a defendant's] knowing exercise of the right to defend himself." 422 U.S.

at 836. The argument also ignores the factual circumstances of Faretta, where the United

States Supreme Court concluded that because a defendant's technical legal knowledge was

irrelevant, that it "need make no assessment of how well or poorly Faretta had mastered . .

. the California code provisions that govern challenges of potential jurors on voir dire." Id.

Missouri appellate courts have also determined that knowledge of the jury selection

procedure is not required when determining whether a defendant is knowingly and

intelligently waiving their right to counsel. See Murray, 469 S.W.3d at 928 (it was

sufficient that the defendant simply "knew that a jury had to be selected").

 The State also argues that Lee "could not state the process for making objections at

trial." However, during the first hearing, the trial court explained the process for making

objections at trial. The trial court stated, "[I]f you had an objection, the party would state

so, approach the bench and state your objection to the Court, and the Court will then make

a ruling on the objection. Do you understand that?" Lee responded that he understood.

The trial court asked if Lee had any questions on the process just described and Lee stated

that he did not. The trial court then asked, "Do you understand it?" and Lee responded,

 32
"Yes, I do." It is true that during the second hearing, the trial court asked whether Lee

could recite the process for making an objection at trial, and Lee responded, "I mean if the

-- I mean I'm not -- no, I can't." Whether Lee could recite the specific procedure for making

objections is immaterial, however, to whether he was minimally familiar with the process

for making objections. Jones, 633 F.3d at 668 ("Requiring knowledge of the substance of

the rules, rather than merely requiring understanding of their existence and importance,

shifts the focus away from whether a defendant's waiver is informed toward whether the

defendant is actually prepared to ably represent himself."). Cf. Murray, 469 S.W.3d at 928

(The defendant did not explicitly state that he understood or was familiar with objection

procedure; rather, he indicated that he had a notion of a strategy for when (or when not to)

make objections, which the Eastern District found sufficient to conclude that defendant

"had minimal familiarity with the trial process and a strategy for making (or not making

objections)."). Lee was not required to demonstrate that he would be proficient at making

objections in order to waive his right to assistance of counsel and exercise his right to self-

representation. His answers to the trial court established that he was at least minimally

familiar with the role of objections at trial as he stated he understood the procedure, twice,

and that he did not have any questions about the procedure.12

 12
 If the trial court was concerned about Lee's familiarity with objection procedure, it could have either
advised Lee about the expectations for making objections at trial, or it could have asked Lee whether he would be
able to come to some understanding about how to make an objection before trial began. See Leonard, 490 S.W.3d at
741 (defendant could not recite the elements for any of his four charges; however, he represented to the trial court
that if given more time, he "would be able to come to some understanding of [] the various elements of [his]
offenses"); Jones, 633 F.3d at 668 ("Although Jones conceded he had not yet learned the rules of procedure, his
request to represent himself was made well before his trial was to begin and he had considerable time to familiarize
himself with the rules if his request was granted."). Lee's Motion was filed four months before trial and his second
Faretta hearing occurred a month and a half before his trial began. Given Lee's repeated and unwavering requests to
represent himself, his demonstrated ability to conduct his own legal research, and the fact that he was already

 33
 The State relies on State v. Johnson, 328 S.W.3d at 395, to support its contention

that Lee was not "minimally familiar with trial process." The State's reliance is misplaced.

In Johnson, the Eastern District found that the trial court erred when it concluded that a

defendant's waiver of counsel was unknowing and unintelligent because he "was mistaken

about one consequence of self-representation, namely that Defendant would not have a

right to assert a claim of ineffectiveness of stand-by counsel." Id. The Eastern District held

that the defendant's "misconception on this point" did not render his waiver unknowing and

intelligent, especially because "[t]he trial court took pains to educate Defendant and correct

his understanding on that point." Id. The Eastern District then noted all of the areas that

the trial court covered in its lengthy Faretta hearing, and that as to each, the defendant

"answered affirmatively when asked if he understood."13 Id. The Eastern District relied

on the lengthy Faretta hearing colloquy to support its conclusion that the "record does not

support a finding that Defendant's request was unknowing and unintelligent." Id.

However, Johnson does not stand for the proposition that the Faretta inquiry conducted by

the trial court established the minimum threshold required for determining that a

defendant's waiver of the right to counsel is knowing and intelligent. Rather, as in this

familiar with Missouri case law, statutes, and at least some of the Missouri Rules of Criminal Procedure, permitting
him time to familiarize himself with objection procedure would have been the preferred route, as opposed to
denying his fundamental right to represent himself at trial simply because he could not recite the process for making
an objection.
 13
 "More generally, a review of the lengthy colloquy reveals that Defendant answered affirmatively when
asked if he understood all of the following: the court system; the role of the judge and prosecutor; the jury selection
process, including his rights under Batson v. Kentucky; his right to counsel; his right to a jury trial; the severity of
the charges; the inadvisability of self-representation in a capital murder trial; the likelihood of conviction and the
possibility of the death penalty; the expectation of compliance with rules of evidence and procedure; general
concepts of the presentation of evidence, including objections and hearsay; the mechanism of jury instructions,
including those on lesser included offense; and generally the risk that, in representing himself, Defendant might act
or omit to his own detriment." Johnson, 328 S.W.3d at 395.

 34
case, a Faretta inquiry will often establish far more than the minimum required to support

a finding that a defendant's waiver of the right to counsel is knowing and intelligent.

 We therefore reject that State's contention that Lee did not establish that his waiver

of the right to counsel was knowing and intelligent. The record establishes that Lee

possessed a significant amount of lay knowledge of the criminal justice system and its

procedures,14 that he had demonstrated an ability to conduct his own research and assemble

coherent legal arguments, and that he had several prior contacts with the criminal justice

system,15 in that he was charged as a prior and persistent offender due to his four prior

felony convictions, and his first trial on these charges ended in a mistrial. The trial court

conducted a thorough inquiry which undeniably opened Lee's eyes to the dangers and

disadvantages of self-representation, and the trial court repeatedly warned Lee that he was

making a poor decision. The record establishes that Lee was aware that he would be held

to the standard that any attorney would be held to at trial, and that he nevertheless still

wished to exercise his right to self-representation. The trial court erred in denying Lee that

right. See Shafer, 969 S.W.2d at 728-29 ("[T]he right to waive counsel is the right

knowingly to proceed in ignorance. It is sufficient for purposes of both the state and federal

constitutions that the record, taken in its entirety, shows that the defendant comprehends

 14
 In addition to the areas already discussed, Lee also correctly stated the charged time period for both
counts, he knew how the case could be resolved, he was able to roughly explain what circumstances could lead to a
Brady violation, and he understood and explained the effect of the trial court's prior and persistent offender finding.
 15
 "While not conclusive on the question of defendant's knowledge of a right to counsel, prior contact with
the criminal justice system is certainly a factor [that a trial court] could consider in reaching their conclusions
regarding whether the waiver was made knowingly and intelligently." State v. Hunter, 840 S.W.2d 850, 859 (Mo.
banc 1992)).

 35
that a waiver of counsel means that he or she will proceed into the labyrinth of the law

without the assistance of a trained guide.").

 "Since the right of self-representation is a right that when exercised usually

increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not

amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation

cannot be harmless." Black, 223 S.W.3d at 153 (citing McKaskle v. Wiggins, 465 U.S. 168,

177 (1984)). Accordingly, we must reverse Lee's convictions.

 The regrettable ramifications of a reversal in this case are not lost on this court.

Lee's first trial on the charges he faced ended in a mistrial. His second trial resulted in a

conviction we are constitutionally required to reverse. Remand for a new trial means the

Victim will be required to testify about the circumstances of Lee's alleged crimes for a third

time. That Lee was found to be a prior and persistent offender, due in part to a prior first-

degree statutory sodomy conviction, only amplifies the angst associated with a reversal.

However, the importance of a defendant's right to self-representation cannot be

understated, and trial courts must respect that right when it is asserted properly. As Faretta

illustrated:

 To force a lawyer on a defendant can only lead him to believe that the law
 contrives against him. . . . The right to defend is personal. The defendant,
 and not his lawyer or the State, will bear the personal consequences of a
 conviction. It is the defendant, therefore, who must be free personally to
 decide whether in his particular case counsel is to his advantage. And
 although he may conduct his own defense ultimately to his own detriment,
 his choice must be honored out of 'that respect for the individual which is the
 lifeblood of the law.'

 36
422 U.S. at 834 (citation omitted). See also United States v. Smith, 830 F.3d 803, 810 (8th

Cir. 2016) ("defendants have 'the right to represent themselves and go down in flames if

they wish[], a right the [trial court] [is] required to respect.'" (quoting United States v. Reed,

668 F.3d 978, 986 (8th Cir. 2012))).

 There is little doubt that apprehension about allowing Lee to represent himself, and

to thus inquire of the Victim at trial, played a role in the trial court's scheduling of a second

hearing to inquire into Lee's request to self-represent. However, that apprehension is

irrelevant to determining whether Lee's waiver of his right to counsel was knowing and

intelligent. "[I]f the trial court had allowed [Lee] to proceed pro se and he had been unable

or unwilling to conduct his own defense without disrupting the essence of the trial process,

the court would have had the authority to revoke [Lee's] right to represent himself." Jones,

633 F.3d at 669 (citing Illinois v. Allen, 397 U.S. 337, 343 (1970)). There are instances, in

fact, where a defendant's knowing and voluntary waiver of the assistance of counsel has

been properly forfeited due to serious obstructionist misconduct directed at victims or

witnesses. See State v. Kowalski, 587 S.W.3d 709, 713 (Mo. App. S.D. 2019) (defendant

engaged in inappropriate communications with his victim's daughters which supported a

finding that his obstructionist behavior was extreme and disruptive); United States v.

Luscombe, 950 F.3d 1021, 1030 (8th Cir. 2020) (defendant "attempted to serve a number

of harassing subpoenas on victims in the case, which were quashed by the magistrate judge,

and he sent threatening emails to government witnesses," which supported the trial court's

termination of his right to self-representation); United States v. Mabie, 663 F.3d 322, 329

(8th Cir. 2011) (defendant "sought to use the court's subpoena power to dissuade potential

 37
witnesses"). Alternatively, the trial court "could have taken the more moderate step of

appointing standby counsel—to assist [Lee] without compromising his ability to perform

the essential functions of conducting his own defense." Jones, 633 F.3d at 669 (citing

McKaskle, 465 U.S. at 174). Regardless, it was not proper to resolve the trial court's

generalized concern about permitting Lee to cross-examine Victim or other witnesses by

denying Lee's knowing and intelligent request to self-represent on a record that established

nothing more than that Lee was unable to respond to a limited number of questions

designed to elicit technical legal knowledge.

 Point Three is granted.

Points One and Two--Sufficiency of the Evidence to Support Lee's Convictions

 Though our disposition of Lee's third point on appeal requires reversal of his

convictions and remand for a new trial, we address the merit of Lee's first and second points

on appeal as the same issue presented in those points will remain an issue on remand.

 In Lee's first two points on appeal, he asserts that there was insufficient evidence to

sustain his convictions for statutory rape in the second degree pursuant to section 566.034,

in that the State was required to prove that Victim was less than seventeen years of age,

but "the evidence in the case established [Victim] was seventeen years old during the

charge period if her life began at conception as required by section 1.205." Lee did not

raise this argument with the trial court during trial or in his motion for new trial. Lee

asserts, however, that his claim is preserved for our review because a "claim that the

evidence was insufficient to support his conviction is preserved on appeal even if not raised

or not timely raised in the trial court." State v. Claycomb, 470 S.W.3d 358, 361 (Mo. banc

 38
2015). The State counters that Lee's first and second points on appeal are not challenges

to the sufficiency of the evidence, but instead challenge the interpretation of a statute, and

that the statutory interpretation issue is not preserved for our review because it was never

raised with the trial court.

 We agree with the State. Lee's sufficiency of the evidence challenges depend for

their very existence on whether section 1.205 is interpreted, as Lee suggests, to require the

Victim's age to be calculated from the date of conception and not from the date of birth.

This is an issue of law involving statutory construction that Lee did not raise with the trial

court. As such, the issue is not preserved for appellate review, and may only be reviewed

for plain error. State v. Lee, 569 S.W.3d 488, 492 (Mo. App. E.D. 2018).

 "Under plain error review, we must determine whether the alleged error is 'evident,

obvious, and clear error' that 'facially establishes substantial grounds for believing that

manifest injustice or a miscarriage of justice' has occurred." State v. Winters, 623 S.W.3d

746, 754 (Mo. App. W.D. 2021) (quoting Campbell, 600 S.W.3d at 788-89). "If error is

found, then we must determine if the error actually resulted in a miscarriage of justice or

manifest injustice." Id. (quoting Campbell, 600 S.W.3d at 789).

 "Our 'primary rule of statutory interpretation is to give effect to legislative intent as

reflected in the plain language of the statute at issue.'" State v. McDonald, 626 S.W.3d

708, 713 (Mo. App. W.D. 2021) (quoting Parktown Imports, Inc. v. Audi of Am., Inc., 278

S.W.3d 670, 672 (Mo. banc 2009)). Appellate courts "resort 'to other rules of statutory

interpretation only when the plain meaning of the statute is ambiguous or defeats the

purpose of the statute.'" Id. (quoting Karney v. Dep't of Labor & Indus. Relations, 599

 39
S.W.3d 157, 162 (Mo. banc 2020)). "Words in a statute are not read in isolation but, rather,

are read in the context of the statute to determine their plain and ordinary meaning." Id.

(quoting Kehlenbrink v. Dir. of Revenue, 577 S.W.3d 798, 800 (Mo. banc 2019)).

 Section 1.205 provides, in relevant part:

 1. The general assembly of this state finds that:

 (1) The life of each human being begins at conception;

 (2) Unborn children have protectable interests in life, health, and well-
 being;

 (3) The natural parents of unborn children have protectable interests
 in the life, health, and well-being of their unborn child.

 2. Effective January 1, 1988, the laws of this state shall be interpreted and
 construed to acknowledge on behalf of the unborn child at every stage of
 development, all the rights, privileges, and immunities available to other
 persons, citizens, and residents of this state, subject only to the Constitution
 of the United States, and decisional interpretations thereof by the United
 States Supreme Court and specific provisions to the contrary in the statutes
 and constitution of this state.

 3. As used in this section, the term "unborn children" or "unborn child" shall
 include all unborn child or children or the offspring of human beings from
 the moment of conception until birth at every stage of biological
 development. . . .

 Lee concedes that "[a] person's age typically is calculated from the date of birth to

the present date," and, that by using Victim's "birthdate to calculate her age, she was sixteen

throughout the charge period on Count I" and Count II. However, Lee argues that "[t]he

legislature, [] redefined when life begins in section 1.205.1(1)" and in Missouri, life begins

at conception. Therefore, Victim's age should have been calculated from conception, and

not from her date of birth. By Lee's calculation, if we subtract 280 days, the period of

 40
human gestation, from Victim's date of birth of June 10, 2000, then she was conceived on

September 4, 1999, and turned seventeen on September 4, 2016. According to Lee, that

would make Victim seventeen through the charged period, rendering the evidence

insufficient to support his convictions for statutory rape in the second degree pursuant to

section 566.034.

 We have twice rejected this same argument. State v. Crider, 554 S.W.3d 460, 462

(Mo. App. W.D. 2018) (holding that "[s]ection 1.205 does not provide a legal basis for

calculating the age of a person based on the date of conception"); Lee, 569 S.W.3d at 492-

93 (finding "no error, plain or otherwise, in the use of Victim's date of birth as the proper

means for calculating her age under the statutes for statutory sodomy and statutory rape").

The Eighth Circuit has also rejected Lee's proposed interpretation of section 1.205:

 Appellant has presented no evidence that the state legislature intended to
 change the sensible and time-honored method of calculating age when it
 enacted Section 1.205. Age has always been calculated from the date of
 birth, which, unlike the precise date of conception, can be determined with
 certainty. Because appellant urges us to adopt a counterintuitive and
 potentially confusing method of calculating age, we believe it is particularly
 imperative to follow [Webster v. Reproductive Health Services, 492 U.S. 490
 (1989)] and leave it to the Missouri courts to decide what legal effect, if any,
 to give to the preamble to the 1986 Missouri Abortion Act. We therefore
 affirm the district court's decision that appellant's age should not be
 calculated from his date of conception pursuant to Section 1.205.

Stiles v. Blunt, 912 F.2d 260, 269 (8th Cir. 1990) (emphasis added).

 Lee argues that Crider and Lee are "deeply flawed and should be revisited" because

they fail to consider two Missouri Supreme Court cases which have applied section 1.205

to hold that an "unborn child" is a "person" for purposes of section 565.024 (the involuntary

manslaughter statute) and section 537.080 (the wrongful death statute). In State v. Knapp,

 41
843 S.W.2d 345, 347-48 (Mo. banc 1992), the Missouri Supreme Court held that section

1.205 was intended to apply to section 565.024, the involuntary manslaughter statute, such

that causing the death of an unborn child is the same as causing the death of a "person" for

purposes of section 565.024. "That unborn children have 'protectable interests in life,

health, and well-being,' and enjoy '. . . all the rights . . . of other persons . . .' (emphasis

added) necessarily implies that unborn children are persons, at least for purposes of

[section] 1.205." Id. at 347. Similarly, in Connor v. Monken Co., 898 S.W.2d 89, 92 (Mo.

banc 1995), the Missouri Supreme Court held that "the legislature intended the courts to

interpret 'person' within the wrongful death statute to allow a natural parent to state a claim

for the wrongful death of his or her unborn child, even prior to viability."

 Lee argues that because Connor stated that section 1.205(2) "sets out the intention

of the general assembly that Missouri courts should read all Missouri statutes in pari

materia" with section 1.205, it follows that section 566.034 must be interpreted alongside

section 1.205, and thus, Victim's age must be measured from conception. Id. We disagree.

 When read in its entirety, section 1.205 is plainly intended to protect the life, health,

and well-being of unborn children in Missouri. That is apparent from the plain language

of the statute, which states that unborn children, and their natural parents, have "protectable

interests in [their] life, health, and well-being." Section 1.205.1(2)-(3). Section 1.205.2

provides that "the laws of this state shall be interpreted and construed to acknowledge on

behalf of the unborn child at every stage of development, all the rights, privileges, and

immunities available to other persons, citizens, and residents of this state[.]"

Accordingly, the Missouri Supreme Court has interpreted section 1.205 to apply to other

 42
statutes which impact the life, health, and well-being of unborn children. See Knapp, 843

S.W.2d at 347-48 (person may be convicted of involuntary manslaughter for the death of

an unborn child); Connor, 898 S.W.2d at 92-93 (natural parents may state a claim for the

wrongful death of their unborn child).

 Lee's argued extension of this reasoning to require the conclusion that age is

calculated from the date of conception and not the date of birth in order to relieve a

defendant of responsibility for committing a crime is inherently inconsistent with section

1.205.2's directive to interpret the laws of this state to acknowledge the rights, privileges

and immunities that should be extended to an unborn child. Moreover, Lee's argued

extension of Connor would obliterate the distinction between "born" and "unborn"

children, in defiance of the plain language of section 1.205 which recognizes that very

distinction.

 We decline to alter the "sensible and time-honored method of calculating age." Lee,

569 S.W.3d at 492-93 (citing Blunt, 912 F.3d at 269) ("We decline to [change the

calculation of age] in place of the legislature, finding that date of birth continues to be the

only sensible method of calculating age under the criminal code."). "[W]e find no

inconsistency in defining life as beginning at conception in terms of determining whether

a child in utero can be the victim of a crime [and whether a natural parent can state a claim

for wrongful death of an unborn child], and treating age in other statutes as constituting the

time since a person's date of birth." Id. at 493. As determined in Crider, "[s]ection 1.205

does not provide a legal basis for calculating the age of a person based on the date of

 43
conception," and Conner and Knapp do not support a contrary conclusion. 554 S.W.3d at

462.

 We find no error, plain or otherwise, in using Victim's date of birth to calculate her

age for purposes of determining whether sufficient evidence established that Lee

committed statutory rape pursuant to section 566.034.

 Points One and Two are denied.

 Conclusion

 The judgment of the trial court is reversed. This matter is remanded to the trial court

for further proceedings consistent with this Opinion.

 __________________________________
 Cynthia L. Martin, Judge

All concur

 44